# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RUBY WAGNER, on behalf of herself and all other similarly situated stockholders of BRP GROUP, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2023-0150-JTL |
| BRP GROUP, INC., | ) ) | |
| Defendant. | ) ) | |

## OPINION ADDRESSING THE VALIDITY OF PROVISIONS IN A GOVERNANCE AGREEMENT

Date Submitted: February 8, 2024
Date Decided: May 28, 2024

Peter B. Andrews, Craig J. Springer, David M. Sborz, Andrew J. Peach, Jackson E. Warren, Jacob D. Jeifa, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Steven J. Purcell, Robert H. Lefkowitz, PURCELL & LEFKOWITZ LLP, New York, New York; *Counsel for Plaintiff.*

S. Mark Hurd, Lauren K. Neal, Alec F. Hoeschel, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Defendant.*

**LASTER, V.C.**

The founder of a business sought to access the public markets. He wanted the freedom to sell the vast bulk of his equity stake while still maintaining control over the business. To achieve that goal, the founder entered into a contract with the corporation. Although it bore the title of "Stockholders Agreement," that document is not an agreement among stockholders regarding the exercise of their stockholder-level rights. It is really a governance agreement in which the corporation confers control rights on the founder.

Among other things, the governance agreement provides that as long as the founder and his affiliates beneficially own at least 10% of the outstanding shares, then the corporation must obtain the founder's prior written approval before it can engage in a lengthy list of actions (the "Pre-Approval Requirements"). A stockholder plaintiff contends that three of the Pre-Approval Requirements are facially invalid (the "Challenged Provisions").

Before defending the Challenged Provisions on the merits, the corporation argues that the plaintiff waited too long to sue. The corporation also argues that because the Stockholders Agreement pre-dated the corporation's IPO and was disclosed when the corporation went public, the plaintiff constructively accepted its terms by buying shares. In legal lingo, the Company relies on the equitable defenses of laches and acquiescence. But if the plaintiff's claims are correct, and the court must assume so when evaluating equitable defenses at the pleading stage, then the Challenged Provisions are void. Equitable defenses cannot validate void acts. The equitable defenses of laches and acquiescence therefore cannot carry the day.

The corporation next asserts that an agreement entered into after the litigation was filed rendered the plaintiff's claims moot. In that agreement, the founder agreed to consent to any action that a newly established independent committee of directors approved unanimously. The standard for mootness, however, requires a showing that an adjudication would no longer have any practical effect. The corporation modified the Challenged Provisions, but it did not eliminate them. An adjudication can still have a practical effect, either by validating or invaliding the Challenged Provisions as modified by the subsequent agreement. The plaintiff's claims are therefore not moot.

On the merits, the plaintiff's attacks on the Challenged Provisions succeed—at least for purposes of those provisions as they existed when the plaintiff filed this lawsuit. First, the plaintiff objects to the requirement that the corporation obtain the founder's prior written approval before permitting the occurrence of, agreeing to, or committing to any significant decision regarding any senior officer (the "Officer Pre-Approval Requirement"). That provision is invalid because it contravenes Section 141(a) of the Delaware General Corporation Law (the "DGCL"). It is also invalid because it contravenes Sections 142(a) and (e).

Next, the plaintiff challenges a requirement that the corporation obtain the founders' prior written approval before permitting the occurrence of, agreeing to, or committing to any charter amendment (the "Charter Pre-Approval Requirement"). That provision likewise contravenes Section 141(a) of the DGCL. It also contravenes Section 242 of the DGCL.

Last, the plaintiff challenges a requirement that the corporation obtain the founders' prior written approval before permitting the occurrence of, agreeing to, or committing to an array of significant transactions (the "Transaction Pre-Approval Requirement"). While that provision or versions of it could well be valid in a commercial agreement, as a feature in a governance agreement, it violates Section 141(a).

As a general matter, the corporation disputes the plaintiff's ability to mount a facial challenge to the Challenged Provisions. Delaware courts have regularly entertained facial challenges, and this case is no different.

But the analysis does not stop there, because the agreement that the corporation and the founder entered into after the litigation added an additional contractual overlay. Under that additional agreement, the founder bound himself to consent to any action that required his pre-approval if the members of a board committee determined that the action was in the best interests of the corporation. The members of the committee comprise all eight of the corporation's independent directors, and the committee must vote unanimously in favor of the proposed action at a meeting at which all of the members of the committee are present.

Those procedural limitations mean that any one committee member can block the determination and permit the founder to withhold his approval. But when determining whether a provision violates Section 141(a), the Delaware Supreme Court has distinguished between substantive and procedural restrictions. The committee mechanism is therefore sufficient to defeat the plaintiff's attacks on the

Challenged Provisions under Section 141(a). The committee mechanism does not affect the violations of Sections 142 or 242.

The Officer Pre-Approval Requirement is facially invalid under Section 142. The Charter Pre-Approval Requirement is facially invalid under Section 242. The plaintiff's motion for judgment on the pleadings is granted as to those provisions on those grounds. Otherwise, the plaintiff's motion for judgment on the pleadings is denied. The Company's cross motion for judgment on the pleadings is granted in part and denied in part to a reciprocal degree.

## I.  FACTUAL BACKGROUND

The facts are drawn from the parties' cross-motions for judgment on the pleadings.[1] The pertinent facts are undisputed.

## A.  The Company And Its Up-C IPO

In 2011, Lowry Baldwin co-founded an insurance business with his son Trevor Baldwin and two other partners.[2] From the outset, Lowry controlled a majority of the equity and served as Chairman and CEO. At some point, the business began operating as a limited liability company named Baldwin Risk Partners, LLC (the "LLC").

---

[1] Citations in the form "PX __" refer to exhibits that the plaintiff submitted with its opening brief or reply brief. Citations in the form "DX__" refer to exhibits that the Company submitted with its opening brief and reply brief. Citations in the form "Tr.__" refer to the oral argument transcript. Dkt. 34.

[2] To avoid confusion, this decision uses the Baldwins' first names without implying familiarity or intending disrespect.

In 2019, the firm prepared to sell equity to the public through an Up-C IPO.[3] That complex piece of legal and financial engineering enables an entity taxed as a partnership to access the public capital markets while maintaining a single level of taxation for the pre-IPO equity holders.

At the time, Lowry owned a majority of the LLC's equity through Baldwin Insurance Group Holdings, LLC ("Holdings"), an entity he still controls. His son, the two partners, several executives, and the former owners of various companies that the firm had acquired held the balance of the equity. Together, they owned 100% of the pre-IPO equity interest in the LLC (collectively, the "Holders").

Lowry and the Holders formed BRP Group, Inc. (the "Company") to serve as the publicly listed vehicle for the IPO. The Company's certificate of incorporation (the "Charter") authorizes two classes of common stock.[4] The Class A common stock carries one vote per share and represents a proportionate ownership interest in the economic value of the Company. The Class B common stock carries one vote per share but has no claim on the Company's economic value; it is purely a governance instrument.

---

[3] Other decisions discuss the standard elements of an Up-C structure. *See, e.g.*, *City of Pittsburgh Comprehensive Mun. Pension Tr. Fund v. Conway*, 2024 WL 1752419, at *3 (Del. Ch. Apr. 24, 2024) (comparing Up-C structure with standard IPO structures); *Colon v. Bumble,* Inc., 305 A.3d 352, 355–58 (Del. Ch. 2023) (discussing a standard Up-C structure and the benefits it confers); *Williams Field Servs. Gp., LLC v. Caiman Energy II, LLC*, 2019 WL 4668350, at *12 (Del. Ch. Sept. 25, 2019) (discussing the basic steps involved in an Up-C IPO). *See generally* Victor Fleischer & Nancy Staudt, *The Supercharged IPO*, 67 Vand. L. Rev. 307, 319–22 (2014) (discussing various Up-C structures and the attendant benefits).

[4] *See* PX 1.

In October 2019, the Company raised capital by issuing Class A shares to the public. The Company used the IPO proceeds to acquire a combination of newly issued LLC units plus additional LLC units from certain Holders. Through those purchases, the Company came to own a number of LLC units that corresponded to the number of issued and outstanding Class A shares.

Meanwhile, the Company issued Class B shares to the Holders that matched the number of LLC units each owned after the IPO. The resulting hybrid equity structure means the Holders participate in the governance and economic fortunes of the business through two separate securities. They participate in governance at the Company level through their Class B shares. They participate in the economic fortunes of the business through their LLC units. Public investors, by contrast, participate in both governance and the economic fortunes of the business through their Class A shares.

Under this framework, the combination of one LLC unit and one Class B share equates to one Class A share. One of the rights that the Holders enjoy enables them to tender matched combinations of LLC units and Class B shares to the Company in exchange for Class A shares, which the Holders can sell on the open market.

After the IPO, the Holders owned Class B shares representing approximately 70% of the Company's outstanding voting power, along with LLC units representing approximately 70% of the economic interest in the LLC. Since the IPO, the Holders have steadily converted their LLC units and Class B shares into Class A shares, which they have sold into the market. When the plaintiff filed the complaint, the

6

Holders owned 23% of the Company's outstanding voting power, which translates to 23% of the economics.

## B. The Pre-Approval Requirements

In connection with the IPO, the Company and the Holders entered into a governance agreement (the "Stockholders Agreement").[5] That agreement sought to confer various rights on the Holders that would permit them to exercise control over the Company even after they sold off their shares. The IPO planners could have built those rights into the Charter. They chose instead to put them in the Stockholders Agreement.

The control rights included the Pre-Approval Requirements. The operative provision states:

> *Approval for Certain Corporate Actions.* Until the Substantial Ownership Requirement is no longer met, [the Company] shall not permit the occurrence of the following matters relating to [the Company] or [the LLC] without first receiving the approval of the Holders holding a majority of the shares of Class B Common Stock held by the Holders as evidenced by a written resolution or consent in lieu thereof:
>
> (a) any transaction or series of related transactions resulting in the merger, consolidation or sale of all, or substantially all, of the assets of [the LLC] and its subsidiaries; any dissolution, liquidation or reorganization (including filing for bankruptcy) of [the LLC] and its subsidiaries or any acquisition or disposition of any asset for consideration in excess of 5% of the Total Assets (as defined below) of [the Company] and its subsidiaries;
>
> (b) any transaction or series of related transactions resulting in the issuance of equity securities, or any other ownership interests, of [the Company], [the LLC] or any of their subsidiaries for consideration

---

[5] PX 3 (cited as "SA").

7

exceeding $10 million, other than under any equity incentive plan that has received the prior approval of the Board of Directors;

(c) any amendments to the certificate of incorporation or bylaws of [the Company], or to the certificate of formation or operating agreement of [the LLC];

(d) the incurrence, guarantee, assumption or refinancing of indebtedness, or grant of a security interest, in each case in excess of 10% of Total Assets (or that would cause aggregate indebtedness or guarantees thereof to exceed 10% of Total Assets);

(e) the establishment or amendment of any equity, purchase or bonus plan for the benefit of employees, consultants, officers or directors;

(f) any capital or other expenditure in excess of 5% of Total Assets;

(g) the declaration or payment of dividends on Class A Common Stock, or distributions by [the LLC] on LLC Units other than Tax Distributions as defined in the Third Amended and Restated Limited Liability Company Agreement of [the LLC];

(h) any change in the size of the Board of Directors;

(i) any change to the location of headquarters, jurisdiction of incorporation, name or fiscal year end of [the Company] or [the LLC] or any change to the designated registered public accounting firm of [the Company];

(j) the adoption of any "poison pill" or similar shareholder rights plan;

(k) any hiring, termination, or replacement of, or establishing the compensation or benefits payable to, or making any other significant decisions relating to the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Partnership Officer or any other senior management or key employee of [the Company] or [the LLC], including entering into new employment agreements or modifying existing employment agreements, adopting or modifying any plans relating to any incentive securities or employee benefit plans or granting incentive securities or benefits to any such individuals under any existing plans; or

8

(l) any agreement or commitment with respect to any of the foregoing.[6]

Those twelve provisions cover most of the significant actions a board can take.

The lead-in to the Pre-Approval Requirements states that the Company cannot take any of the listed actions without "first receiving the approval of the Holders holding a majority of the shares of Class B Common Stock held by the Holders."[7] Through a separate voting agreement, certain Holders committed to vote as Lowry directed, giving him control over their shares as well. Lowry therefore controls the exercise of the Pre-Approval Requirements.

The Pre-Approval Requirements remain in effect until the Holders' collective beneficial ownership falls below the Substantial Ownership Requirement. The Stockholders Agreement defines that term to mean ten percent of the Company's outstanding common stock.[8] The Company cannot terminate the Stockholders Agreement, and its terms cannot be modified without the Holders' prior written consent (which means without Lowry's prior written consent). The Pre-Approval Requirements therefore will remain in effect until the Holders' ownership drops below 10%, unless Lowry voluntarily gives up his rights earlier.

---

[6] *Id.* § 1.01(a)–(l).

[7] *Id.*

[8] *Id.* at § 4.02(d).

## C. The Challenged Provisions

The plaintiff owns Class A shares that she purchased in December 2020. She filed the complaint in this action on February 8, 2023. She only attacks the Challenged Provisions. At oral argument, the plaintiff's counsel confirmed that they were not conceding the validity of any other aspects of the Pre-Approval Requirements. The plaintiff simply decided to target what his lawyer regarded as low-hanging fruit.[9]

The first Challenged Provision is the Officer Pre-Approval Requirement. It requires that the Company obtain Lowry's prior written approval before permitting the occurrence of, entering into any agreement regarding, or making any commitment with respect to

> any hiring, termination, or replacement of, or establishing the compensation or benefits payable to, or making any other significant decisions relating to the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Partnership Officer or any other senior management or key employee of [the Company] or [the LLC], including entering into new employment agreements or modifying existing employment agreements, adopting or modifying any plans relating to any incentive securities or employee benefit plans or granting incentive securities or benefits to any such individuals under any existing plans[10]

The Officer Pre-Approval Requirement has particular salience given that Trevor Baldwin, Lowry's son, serves as CEO. In light of the Officer Pre-Approval Requirement, the Board must retain Trevor as CEO indefinitely and cannot make

---

[9] Tr. at 62–63.

[10] SA § 1.01(k).

any "significant decision" relating to his employment unless Lowry gives his prior written approval.

The Charter Pre-Approval Requirement requires the Company to obtain Lowry's prior written approval before permitting the occurrence of, entering into any agreement regarding, or making any commitment with respect to "any amendments to the certificate of incorporation" of the Company.[11] That phrase appears within a larger provision that applies to "any amendments to the certificate of incorporation or bylaws of [the Company], or to the certificate of formation or operating agreement of [the LLC]."[12] The plaintiff only challenges the aspect that applies to a charter amendment.

The Transaction Pre-Approval Requirement requires the Company to obtain Lowry's prior written consent before permitting the occurrence of, entering into any agreement regarding, or making any commitment with respect to:

> any transaction or series of related transactions resulting in the merger, consolidation or sale of all, or substantially all, of the assets of [the LLC] and its subsidiaries; any dissolution, liquidation or reorganization (including filing for bankruptcy) of [the LLC] and its subsidiaries or any acquisition or disposition of any asset for consideration in excess of 5% of the Total Assets (as defined below) of [the Company] and its subsidiaries[.][13]

---

[11] *Id.* § 1.01(c).

[12] *Id.*

[13] *Id.* § 1.01(a).

The Transaction Pre-Approval Requirement thus addresses a range of transactions at the LLC level. It also prohibits any acquisition or disposition of any material amount of assets (5% or greater) by the Company.

## D. The Consent Agreement

In May 2023, in response to this litigation, the Company and Holdings entered into a Consent and Defense Agreement (the "Consent Agreement").[14] In that agreement, Holdings committed to approve any matter requiring consent under the Stockholders Agreement if the matter received unanimous approval from all of the members of a committee comprising all of the Company's independent directors (the "Independent Committee"). The pertinent language states:

> [Holdings], by executing this Agreement, irrevocably consents to and approves, on behalf of itself and the other Holders, any Specified Matter that the Independent Committee determines in good faith is in the best interests of [the Company] and its stockholders in their capacity as such, and irrevocably agrees, on behalf of itself and the other Holders, that this consent shall satisfy the [Pre-Approval Requirements] with respect to such Specified Matter; provided, however, that the consent set forth in this paragraph 1 shall be inoperative and of no further force and effect upon the termination of this Agreement in accordance with its terms.[15]

The Consent Agreement thus ensures that the Pre-Approval Requirements do not apply if the Independent Committee "determines in good faith [that an action] is in

---

[14] DX D (cited as "CA").

[15] CA § 1. Under the Committee Provision, "Independent Director" means "a director who the Board determines both: (i) qualifies as an independent director under the corporate governance standards of Nasdaq and (ii) has no relationship with the Corporation or any Holder that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director." DX E §4.02 (the "Committee Provision").

the best interests of [the Company] and its stockholders in their capacity as such"

(the "Committee Waiver").

Contemporaneously, the Company's board of directors (the "Board") amended

the bylaws.[16] The amendment states:

> A committee of the Board (the "<u>Independent Committee</u>") is designated by the adoption by the Board of this Section 4.02 of these By-laws. The Independent Committee shall be composed of all of the Independent Directors (as defined below) then in office . . . . The Independent Committee shall have the full power and authority of the Board to make, solely for purposes of the [Consent Agreement], any determination contemplated by Paragraphs 1 and 2 thereof, and with respect to amending, waiving or enforcing any term of the [Consent Agreement], and to take any action and engage any such advisors or counsel as it deems necessary in connection therewith.[17]

The Committee Provision thus empowers the Independent Committee with the full

power and authority of the Board for purposes of any Committee Waiver.

The Committee Provision does not, however, authorize the Independent

Committee to exercise all of the authority that the DGCL would permit. The relevant

language states that:

> Notwithstanding anything to the contrary in the General Corporation Law or these By-laws:
>
> (a) . . . the member or members present at any meeting and not disqualified from voting may not appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member;

---

[16] PX 2 (the "Bylaws").

[17] DX E § 4.02.

(b) the Independent Committee may not create any subcommittees;

(c) all of the members then serving on the Independent Committee shall be required to constitute a quorum for the transaction of business of the Independent Committee;

(d) the affirmative vote of all members of the Independent Committee shall be the act of the Independent Committee;

(e) the Independent Committee may, but is not required to, elect a chairperson from among its members; and

(f) the Independent Committee may make, alter and repeal rules and procedures for the conduct of its business so long as such rules and procedures are not inconsistent with this Section 4.02.[18]

The Committee Provision also mandates that the Independent Committee act unanimously at a meeting at which all of its members are present.

Under this suite of provisions, a lone Independent Director can block a Committee Waiver, either by voting no, by abstaining from a vote, or by failing to appear and preventing the existence of a quorum. If any one Independent Director does any of those things, then Lowry can exercise the applicable Pre-Approval Requirement.

According to the Company's April 2023 proxy statement, eight of the eleven members of the Board qualify as Independent Directors.[19] Only Lowry, Trevor, and Kris Wiebeck, the Company's Chief Strategy Officer, are considered non-

---

[18] *Id.* (formatting added).

[19] DX P at 11.

14

independent. Thus, the Consent Agreement only authorizes a Committee Waiver if all eight Independent Directors vote unanimously to approve a Committee Waiver.

The Consent Agreement also obligates the Company to indemnify the Holders for any liabilities incurred in connection with the Stockholders Agreement and the Consent Agreement (the "Indemnity Provision").[20] If litigation arises over either, then the Company must pay Lowry's fees and expenses in addition to the Company's own.

## II.    LEGAL ANALYSIS

The parties have filed cross-motions for judgment on the pleadings. Under Court of Chancery Rule 12(c), "[a] motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[21] When ruling on dueling Rule 12(c) motions, the court must "view the facts pleaded and the inferences to be drawn from such facts . . . in a light most favorable to the non-moving party."[22] Here, the parties agree on the facts. They only disagree about issues of law.

This decision proceeds in four parts. First, it addresses the Company's reliance on the equitable defenses of laches and acquiescence. Next, it considers whether the Consent Agreement mooted the plaintiff's claims. Having dealt with those

---

[20] CA § 3.

[21] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[22] *Id.*

15

preliminary issues, it evaluates the facial challenge to the Challenged Provisions. Finally, it considers the implications of the Consent Agreement.

## A.      The Equitable Defenses

The Company argues at the outset that the plaintiff cannot assert her claims because the doctrines of laches and acquiescence bar any challenge. This court addressed virtually identical arguments in a recent decision.[23] The same analysis applies here. Because the analysis carries over, this decision does not repeat all of the points that the prior decision made.

### 1.      Equitable Defenses Cannot Validate Void Acts.

The Company's equitable defenses fail out of the gate because equitable defenses cannot validate void acts. If the plaintiff's theories are correct—and the court must assume they are when analyzing whether equitable defenses can prevail at the pleading stage—then the Challenged Provisions are void. Equitable defenses therefore do not apply.

The Company advances one new argument that the *Moelis Preliminary Issues* decision did not address. According to the Company, language from Chancellor Allen's decision in *Grimes I* supports viewing the Challenged Provisions as "voidable in equity" rather than void.[24] That is not correct.

---

[23] *See W. Palm Beach Firefighters Pension Fund v. Moelis & Co. (Moelis Preliminary Issues)*, 310 A.3d 985, 993–1010 (Del. Ch. 2024).

[24] Def.'s Opening Br. at 24–25 (discussing *Grimes v. Donald (Grimes I)*, 1995 WL 54441 (Del. Ch. Jan. 11, 1995), *aff'd*, 673 A.2d 1207 (Del. 1996)).

Properly understanding the *Grimes I* decision requires starting with Professor

Berle's famous formulation:

> [I]n every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.[25]

Delaware follows the twice-testing formula.[26]

The first test—Berle I—asks whether corporate action complied with "the

hierarchical components of the entity-specific corporate contract, comprising (i) the

Delaware General Corporation Law, (ii) the corporation's charter, (iii) its bylaws, and

(iv) other entity-specific contractual agreements . . . ."[27] That analysis turns on an

objective comparison of the challenged arrangement with more senior components of

the entity-specific corporate contract, including the DGCL.

The second test—Berle II—asks whether the directors who took the corporate

action breached their fiduciary duties of loyalty and care by failing to act in good faith,

by making decisions when they were self-interested or not independent, or by acting

in a grossly negligent manner. That analysis turns primarily on (i) what the directors

knew, believed, and intended at the time when they acted, (ii) any conflicts of interest

---

[25] Adolf A. Berle, Jr., *Corporate Powers as Powers in Trust*, 44 Harv. L. Rev. 1049, 1049 (1931).

[26] *Coster v. UIP Cos., Inc.*, 255 A.3d 952, 960 (Del. 2021).

[27] *Quadrant Structured Prods. Co., Ltd. v. Vertin (Quadrant II)*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014).

17

that the directors labored under when acting, and (iii) the process the directors followed.

The two tests are distinct. Conduct can be legal (passing Berle I) but inequitable (failing Berle II).[28] Conduct also can be illegal (failing Berle I) and yet there could be situations where it would be equitable (passing Berle II).[29] The vast majority of corporate actions satisfy both Berle I and Berle II. Some, such as a deferred redemption provision in a stockholder rights plan, violate both Berle I and Berle II.[30]

In *Grimes I*, Chancellor Allen emphasized the distinctive nature of the two types of challenges. There, a plaintiff contended that a CEO's employment agreement violated Section 141(a) by preventing the board from overseeing and, if necessary, terminating him.[31] The defendants tried to recharacterize the claim as a derivative

---

[28] *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971) ("[I]nequitable action does not become permissible simply because it is legally possible.").

[29] *Compare Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 958 (Del. 1985), *with* Securities Exchange Act of 1934, 17 C.F.R. § 240.14d-10.

[30] *Compare Mentor Graphics Corp. v. Quickturn Design Sys., Inc. (Quickturn I)*, 728 A.2d 25, 44 (Del. Ch. 1998) (enjoining deferred redemption provision as a breach of fiduciary duty), *with Quickturn Design Sys., Inc. v. Shapiro (Quickturn II)*, 721 A.2d 1281, 1283 (Del. 1998) (affirming *Quickturn I* on other grounds; holding that deferred redemption provision conflicted with Section 141(a)).

[31] *Grimes I*, 1995 WL 54441, at *1. There were actually three interrelated agreements, but it is easier to frame the issue as if they were all part of a single employment agreement.

18

action for breach of fiduciary duty that should be dismissed under Rule 23.1.[32] Chancellor Allen rejected that characterization:

> Whether these contracts do violate Section 141 is a question of law directly concerning the legal character of the contract and its effect upon the directors. The question whether these contracts are valid or not does not fall into the realm of business judgment; it cannot be definitively determined by the informed, good faith judgment of the board. It must be determined by the court.[33]

By contrast, Chancellor Allen agreed that the fiduciary duty challenges to the agreement were subject to Rule 23.1, and he dismissed them on that basis.[34]

As the Company correctly points out, Chancellor Allen used the words "voidable in equity" when describing the basic issues in the case. At the outset of the decision, he stated:

> It is the alleged practical effect of these contracts that is said to constitute the abdication of directorial responsibility. I assume for purposes of resolving this dispute that, at least under some circumstances, that such an effect of an employment contract would render it voidable in equity.[35]

But by using that phrase when describing an assumption he made, Chancellor Allen did not elide the two types of claims such that he transformed a statutory Berle I challenge into a Berle II challenge "in equity." Nor did he hold that the statutory

---

[32] *Id.* at *7.

[33] *Id.*

[34] *Id.* at *8.

[35] *Id.* at *9–10 (emphasis omitted).

19

violation rendered the contract voidable such that equitable doctrines could apply. To the contrary, as noted, he distinguished between the legal and equitable claims.

Regardless, on appeal, the Delaware Supreme Court ruled definitively. Adopting the test that Chancellor Seitz created in his seminal decision in *Abercrombie v. Davies*,[36] the justices held that "[a] court 'cannot give legal sanction to agreements which have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters.'"[37] The Delaware Supreme Court thus made clear that the claim at issue asserted that the employment agreement conflicted with Section 141(a) and was void. The plaintiff had not asserted a fiduciary claim that could render the contract voidable in equity. On the facts presented, the high court agreed with Chancellor Allen that the employment agreement with the CEO did not create a Section 141(a) issue.[38]

The Company also relies on *Coinmint*, where this court observed that "voidable breaches of LLC agreements are subject to equitable defenses, including waiver, estoppel, and laches."[39] That precedent is inapposite because this case does not involve an LLC agreement, and LLCs are sufficiently different from corporations that

---

[36] *Abercrombie v. Davies*, 123 A.2d 893 (Del. Ch. 1956), *rev'd on other grounds,* 130 A.2d 338 (Del. 1957).

[37] *Grimes v. Donald (Grimes II)*, 673 A.2d 1207, 1214 (Del. 1996) (quoting *Abercrombie*, 123 A.2d at 899).

[38] *Grimes II*, 673 A.2d 1207, 1215 n.4; *Grimes I*, 1995 WL 54441, at *9.

[39] *In re Coinmint, LLC*, 261 A.3d 867, 892 (Del. Ch. 2021).

20

voidness principles do not readily translate. The LLC's hierarchy—consisting of (i) the Delaware Limited Liability Company Act, (ii) the certificate of formation, and (iii) the LLC agreement—corresponds only loosely to the corporate hierarchy of (i) the DGCL, (ii) the certificate of incorporation, and (iii) the bylaws. There are fundamental differences between what a certificate of formation must contain (virtually nothing) and what a certificate of incorporation must contain (six enumerated items including the number and types of shares the corporation can issue and any special rights, powers, privileges, qualifications, and limitations on those shares).[40] And there are fundamental differences between what an LLC can achieve through its constitutive document (minimally constrained) and what a corporation can achieve (moderately constrained). Most notably, the pivotal document for an LLC (the LLC agreement) can (i) fully eliminate any duties existing at law or in equity, including fiduciary duties,[41] (ii) provide indemnification and advancement unconstrained by any

---

[40] *Compare* 6 *Del. C.* § 18-201(a) *with* 8 *Del. C.* § 102(a).

[41] *See* 6 *Del. C.* § 18-1101(c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing."). When the General Assembly adopted Section 18-1101(e), Delaware decisions had not yet distinguished cleanly between the concept of good faith in fiduciary law and the role that the implied covenant of good faith and fair dealing plays as a source of implied contractual terms. *See, e.g.*, *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418–19 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013); *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *7 n.74 (Del. Ch. Jan. 29, 2015). The statement that an LLC agreement "may not eliminate the implied contractual covenant of good faith and fair dealing" seems like an attempt to preserve some form of obligation to act in good faith. *Gerber*,

statutory standards,[42] and (iii) fully eliminate any and all liabilities, except for *bad faith* breaches of the implied covenant of good faith and fair dealing.[43] By contrast,

---

67 A.3d at 409. But in its role as a source of implied terms, the implied covenant cannot fulfill that mission, because the implied covenant does not operate as a fiduciary substitute. *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008) ("The implied covenant of good faith and fair dealing is a creature of contract, distinct from the fiduciary duties that the plaintiff asserts here."). And express terms displace it, enabling alternative entity agreements to authorize a decision maker to consider and act based on its own interests, irrespective of the entity's interests. *See, e.g.*, *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 361 (Del. 2013) (enforcing provision that allowed a general partner to "consider only such interests and factors as it desires"); *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 181 (Del. Ch. 2014) (upholding provision that "confers contractual discretion on the Conflicts Committee to balance the competing interests of the Partnership's various entity constituencies when determining whether a conflict-of-interest transaction is in the best interests of the Partnership"), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE); Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law*, 60 Bus. Law. 1469, 1484 (2005) (recommending that alternative entity agreements provide that the decision maker be granted discretion to "consider only such interests and factors as it desires, including its own interests," and eliminate any "duty or obligation to give any consideration to any interest of or factors affecting the" entity or its investors). Nor does the statutory mandate to preserve the implied covenant provide incremental protection, because the implied covenant of good faith and fair dealing already inheres in every contract governed by Delaware law and cannot be eliminated. *See Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442–43 (Del. 2005).

[42] *See* 6 *Del. C.* § 18-108 ("Subject to such standards and restrictions, if any, as are set forth in its limited liability company agreement, a limited liability company may, and shall have the power to, indemnify and hold harmless any member or manager or other person from and against any and all claims and demands whatsoever.").

[43] *See* 8 *Del. C.* § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing."). Like the statutory preservation of the implied covenant of good faith and fair dealing in Section 18-1101(c), the statutory preservation of liability for bad faith violations of the implied covenant was likely an attempt to retain accountability for intentional misconduct that ran contrary to the best interests of the entity. But here again, the implied covenant cannot fulfill its mission, because it is not a fiduciary substitute. *See Wood*, 953 A.2d at 143. It is also wickedly difficult under Delaware law to prove a claim for breach of

the constitutive documents of a corporation (the charter and bylaws) (i) can shape fiduciary duties but cannot eliminate them,[44] (ii) cannot eliminate monetary liability for breach of fiduciary duty except for breaches of the duty of care,[45] (iii) cannot provide indemnification or advancement that goes beyond statutory standards,[46] and (iv) cannot constrain liability for breach of the implied covenant of good faith and fair dealing.[47] For purposes of voidness doctrine, corporate acts that violate the charter are void, although potentially subject to validation under Sections 204 and 205.[48] Violations of an LLC agreement are typically voidable, but the LLC agreement can make violative actions incurably void as a matter of contract.[49] In its assessment of

___

the implied covenant, and all the more so to prove a *bad faith* breach of an *implied* term. "Rather than preserving a measure of accountability by imposing a meaningful floor, the statutory limit on exculpation sets the bar at the band sill." *Bamford v. Penfold, L.P.*, 2022 WL 2278867, at \*33 n.18 (Del. Ch. June 24, 2022).

[44] *See New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 544–74 (Del. Ch. 2023).

[45] *See 8 Del. C.* § 102(b)(7).

[46] *See 8 Del. C.* § 145.

[47] *See, e.g., In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at \*17 (Del. Ch. Mar. 6, 2012) (explaining that implied covenant of good faith and fair dealing inhered in charter and bylaws); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1032 (Del. Ch. 2004) (deploying implied covenant of good faith and fair dealing when interpreting certificate of incorporation), *aff'd*, 872 A.2d 559 (Del. 2005).

[48] *See 8 Del C.* §§ 204, 205.

[49] *See Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 932 (Del. 2023); *CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 818 (Del. 2018).

the law, *Coinmint* states accurately that "void acts are *ultra vires* and generally cannot be ratified."[50] Otherwise, *Coinmint* is not pertinent to this case.

When the General Assembly enacts a statute, that statute embodies Delaware's public policy.[51] "Under Delaware common law, contracts that offend public policy or harm the public are deemed void as opposed to voidable."[52] If the Challenged Provisions violate the DGCL, then they are void.[53] Equitable defenses, including laches, cannot validate void acts.[54] Given the theory of the complaint, the Company cannot rely on equitable defenses to defend the Stockholders Agreement.

---

[50] *Coinmint*, 261 A.3d at 890 (quoting *CompoSecure*, 206 A.3d at 816).

[51] *Edwards v. William H. Porter, Inc.*, 1991 WL 165877, at *8 (Del. Super. Ct. July 26, 1991), *aff'd*, 616 A.2d 838 (Del. 1992) ("Through the enactment of statutes, the General Assembly declares the public policy of the State, not the courts.") (citing *Ames v. Wilm. Hous. Auth.*, 233 A.2d 453, 456 (Del. 1967)).

[52] *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, *ex rel. Christiana Bank & Tr. Co.*, 28 A.3d 1059, 1067 (Del. 2011).

[53] *See XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 651 (Del. Ch. 2022) ("[T]he Delaware Supreme Court has stated that 'contracts that offend public policy or harm the public are deemed void,' . . . and the Delaware Superior Court has summarized the applicable principles as follows: 'As a general rule, agreements against public policy are illegal and void. . . . [P]ublic policy may be determined from consideration of the federal and state constitutions, the laws, the decisions of the courts, and the course of administration.'") (first quoting *PHL*, 28 A.3d at 1067, then quoting *Sann v. Renal Care Ctrs. Corp.*, 1995 WL 161458, at *5 (Del. Super. Ct. Mar. 28, 1995)), *aff'd in pertinent part, rev'd in other part*, 304 A.3d 896 (Del. 2023).

[54] *XRI*, 283 A.3d at 641–42; *Absalom Absalom Tr. v. Saint Gervais LLC*, 2019 WL 2655787, at *3 (Del. Ch. June 27, 2019); *see STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1137 (Del. 1991); *Waggoner v. Laster*, 581 A.2d 1127, 1137 (Del. 1990). As noted, Sections 204 and 205 of the DGCL "provide mechanisms for a corporation to unilaterally ratify defective corporate acts or seek relief from the Court of Chancery to validate any corporate act under certain circumstances." *Holifield*, 304 A.3d at 931. Those statutes can be used to validate void acts; equitable defenses still cannot.

24

## 2. Additional Reasons Why The Laches Defense Fails

Assuming laches could apply, the Company cannot prevail on that defense because the plaintiff did not delay unreasonably after the point when the claim accrued, and the Company cannot show prejudice. The Company does not advance any arguments that differ from those addressed in the *Moelis Preliminary Issues* decision, so this decision does not repeat that analysis.[55]

## 3. The Other Equitable Defenses Fail.

The Company also invokes the equitable defenses of waiver, acquiescence, and estoppel. Assuming those equitable defenses could apply, they too fall short.

"Waiver is the voluntary and intentional relinquishment of a known right."[56] In contrast, "[f]or the defense of acquiescence to apply, conscious intent to approve the act is not required . . . ."[57] Either equitable defense may result in "'a judicial remedy by which a party may be precluded by its own act or omission from asserting a right to which it otherwise would have been entitled . . . .'"[58]

The Company contends that because the Company disclosed the Challenged Provisions in connection with its IPO, the plaintiff acquiesced to the arrangement, waived any right to challenge the Challenged Provisions, and is estopped from

---

[55] *Moelis Preliminary Issues*, 310 A.3d at 994–1000.

[56] *Realty Growth Invs v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982).

[57] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014).

[58] *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 12 (Del. 2000) (quoting 28 Am. Jur. 2d *Estoppel and Waiver* § 28, at 453 (2000)).

challenging them now. This argument fails because it relies upon the premise that the Challenged Provisions are voidable, rather than void.[59] If the Challenged Provisions violate the DGCL, then they are void, not voidable, and equitable defenses cannot validate void acts. The *Moelis Preliminary Issues* decision addressed these matters at greater length.[60]

Because equitable defenses cannot validate void acts the Company cannot rely upon waiver, acquiescence, and estoppel. Those defenses do not bar the plaintiff from bringing the facial challenge.

## B.    Mootness

In addition to its equitable defenses, the Company contends that the Consent Agreement renders the plaintiff's claims moot. Although the Consent Agreement changed how the Challenged Provisions operate, it did not moot the plaintiff's claims.

The Delaware Supreme Court recently summarized the standard for mootness as follows:

> [A] party seeking to employ the mootness doctrine, typically the defendant, bears the burden of establishing that the controversy has become moot. The mootness doctrine addresses cases where a controversy existed at the time the plaintiff commenced litigation but the controversy later dissolves. Where a defendant voluntarily discontinues their conduct in response to a complaint being filed, we apply the mootness doctrine. In those cases, voluntary cessation does not automatically deprive the court of jurisdiction to hear the case.

---

[59] *See* Def.'s Opening Br. at 30–31.

[60] *Moelis Preliminary Issues*, 310 A.3d at 993–94.

Under the mootness standard, the defendant bears the "heavy" burden of proving the controversy has become moot.[61]

"A dispute is moot only if a grant of relief cannot have any practical effect on the existing controversy," and "a court should not dismiss claims unless it is certain they could have no practical effect on the parties if adjudicated."[62] The Company argues that the Consent Agreement rendered the plaintiff's claims moot because Lowry waived his right to invoke any of the Pre-Approval Requirements if the Independent Committee unanimously determines in good faith that an action is in the best interests of the Company and its stockholders.[63] That provision *modifies* the circumstances under which Lowry can rely on the Pre-Approval Requirements, but it does not eliminate Lowry's ability to invoke the Pre-Approval Requirements.

The plaintiff's claims are therefore not moot. The plaintiff can—and does—continue to contend that the Challenged Provisions are statutorily invalid, notwithstanding the Consent Agreement.

## C. The Officer Pre-Approval Requirement

Turning to the merits, the plaintiff first challenges the Officer Pre-Approval Requirement. As it appears in the Stockholders Agreement, that provision is invalid

---

[61] *Empls. Ins. Co. of Wausau v. First State Orthopaedics, P.A.*, 2024 WL 74148, at *7 (Del. Jan. 8, 2024) (footnotes omitted) (emphasis omitted).

[62] *Cont'l Auto. Sys., Inc. v. Nokia Corp.*, 2023 WL 1370523, at *11 (Del. Ch. Jan. 31, 2023) (cleaned up) (citing *PPL Corp. v. Riverstone Hldgs. LLC*, 2020 WL 3422397, at *3 (Del. Ch. June 22, 2020)); *see* Def.'s Reply Br. at 26 (quoting *Cont'l Auto. Sys.*, 2023 WL 1370523, at *11).

[63] CA § 1.

27

for two separate and independent reasons. It violates Section 141(a), and it also violates Section 142(a) and (e).

### 1. The Section 141(a) Challenge

The plaintiff contends that the Officer Pre-Approval Requirement violates Section 141(a) of the DGCL. That section states: "The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."[64]

An extensive body of Delaware precedent dating back over a century has analyzed claims under Section 141(a) and its predecessors.[65] In a recent decision, this court examined those precedents and concluded that the overwhelming weight of authority recognizes the viability of a Section 141(a) challenge to a nominally third-party agreement that nevertheless restricts board authority.[66]

Having conducted that review, the court discerned a two-part test. Initially, the court must determine whether Section 141(a) applies. That requires evaluating "whether the challenged provision constitutes part of the corporation's internal

---

[64] 8 *Del. C.* § 141(a).

[65] *See W. Palm Beach Firefighters' Pension Fund v. Moelis & Co. (Moelis Merits)*, 311 A.3d 809, 831–861 (Del. Ch. 2024).

[66] *Id.* at 859–62.

28

governance arrangement. If not, then the inquiry ends."[67] A constraint that appears in a non-governance arrangement does not give rise to a Section 141(a) issue.

If the challenged provision appears in a governance arrangement, then the court moves to the second step.[68] At that point, the court evaluates the validity of the provision under the test that Chancellor Seitz established in *Abercrombie* and the Delaware Supreme Court adopted in *Grimes II*.[69] Under that test, governance restrictions violate Section 141(a) when they "have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters" or "tend[] to limit in a substantial way the freedom of director decisions on matters of management policy . . . ."[70]

The *Moelis Merits* decision addressed a challenge to eighteen pre-approval requirements which, in their entirety, transferred control over the business and affairs of the corporation to the counterparty and prevented the board from acting like a board.[71] Here, the plaintiff might have challenged the Pre-Approval Requirements collectively, as in the *Moelis Merits* decision. That likely would have

---

[67] *Id.* at 828.

[68] *Id.* at 855–56.

[69] *Id.* at 860.

[70] *Abercrombie*, 123 A.2d at 899.

[71] *Moelis Merits*, 311 A.3d at 826 ("Viewed in their totality, the Pre-Approval Requirements mean that the Board must get Moelis' signoff in advance for virtually any action the directors might want to take.").

been an easier sell, because the plaintiff could have contended, as in *Moelis Merits*, that the Pre-Approval Requirements violated Section 141(a) in their totality. Instead, the plaintiff opted to target the three Challenged Provisions individually.

The fact that the Challenged Provisions only address specific areas of corporate action does not enable them to evade Section 141(a) analysis. Many of the Section 141(a) precedents involved challenges to specific provisions.[72]

### a. The Governance Arrangement Inquiry

The first step in analyzing a Section 141(a) claim requires determining whether the challenged provision appears in a governance arrangement addressing internal affairs issues. A court can consider multiple factors when determining whether an agreement qualifies as a governance arrangement addressing internal affairs.[73]

---

[72] *E.g., Abercrombie*, 123 A.2d at 894–98 (holding that a voting agreement, purporting to directly or indirectly bind the directors to vote for nominees selected by shareholder members to the voting agreement, was invalid under Section 141(a)); *Carmody v. Toll Bros.*, 723 A.2d 1180, 1189–91 (Del. Ch. 1998) (invalidating a rights plan under Section 141(a) because only the incumbent directors who adopted the plan, or their hand-picked successors, could redeem it); *ACE Ltd. v. Capital Re Corp.*, 747 A.2d 95, 97, 106 (Del. Ch. 1999) (holding that a no-talk provision within a merger agreement was "likely invalid" because the provision "involves an abdication by the board of its duty to determine what its own fiduciary obligations require at precisely that time in the life of the company when the board's own judgment is most important."); *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512 at *4 (Del. Ch. Apr. 28, 2004) (ruling that Section 141(a) did not allow a stockholder agreement to prevent the board from providing small shareholders with responsive disclosures to a books and records request); *Gorman v. Salamone*, 2015 WL 4719681 (Del. Ch. July 31, 2015) (invalidating provision that purported to give stockholders the right to remove officers as this "would unduly constrain the board's ability to manage the Company.").

[73] *Moelis Merits*, 311 A.3d at 858–60.

One consideration is whether the challenged provisions appear in a contract that the DGCL specifically authorizes.[74] The DGCL governs a corporation's internal affairs, so when the DGCL specifically authorizes a particular type of agreement, that agreement is more likely to affect the corporation's internal affairs than an agreement that the DGCL does not contemplate. Here, the Challenged Provisions appear in a stockholders agreement, which Section 218 of the DGCL authorizes.[75]

Another consideration is whether the counterparties to the agreement hold roles as intra-corporate actors, such as officers, directors, stockholders, or their affiliates.[76] Delaware law governs the corporation's internal affairs, *viz.* "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders."[77] Consequently, when the counterparties to an agreement hold those roles, the agreement is more likely to be a governance agreement that addresses internal affairs. By contrast, in a typical commercial contract, the counterparty is more likely to be service providers, customers, or suppliers, including suppliers of capital.

---

[74] *Id.* at 863–64.

[75] 8 *Del. C.* § 218(e).

[76] *Moelis Merits*, 311 A.3d at 858–60.

[77] *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982); *accord McDermott Inc. v. Lewis*, 531 A.2d 206, 214 (Del. 1987) ("Internal corporate affairs involve those matters which are peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders.").

Here, the Challenged Provisions appear in the Stockholders Agreement, and the parties to that agreement are the Company and the owners of the business before its IPO. Lowry owned a majority of the ownership interest pre-IPO, and he has the right to vote a majority of the Class B shares under the Voting Agreement. Effectively, therefore, the Stockholders Agreement is between the Company and Lowry. Lowry also holds other intra-corporate roles. He co-founded the Company's predecessor and was Chairman and CEO until 2019. He remains Chairman and his son, Trevor, succeeded him as CEO.

A third consideration is whether the agreement contains provisions that actually seek to regulate how, when, or the extent to which a corporation exercises its power.[78] The DGCL grants corporations a series of powers,[79] but because a corporation can only act through humans, internal corporate actors determine whether, when, and to what extent a corporation exercises its powers.[80] By contrast, Delaware law need not govern external issues, and when determining what law governs the corporation's external interactions, Delaware courts use the "most significant relationship" test.[81]

---

[78] *Moelis Merits*, 311 A.3d at 858–60.

[79] *See* 8 *Del. C.* §§ 121–123.

[80] *See Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 439–443 (Del. Ch. 2020) (explaining the difference between corporate power and the proper authorization and exercise of corporate power).

[81] *E.g.*, *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017) ("Delaware follows the Second Restatement's 'most significant relationship'

The Challenged Provisions constrain the Company's ability to exercise its corporate powers by requiring Lowry's prior written approval before the Company can take action on specified internal matters, such as significant decisions relating to senior officers, charter amendments, or material transactions. The Challenged Provisions seek explicitly to regulate the Company's internal affairs.

A fourth consideration is the extent to which the terms of the agreement resemble provisions that appear in the DGCL or that might ordinarily be found in one of the corporation's constitutive documents, such as its certificate of incorporation (including a certificate of designations) or bylaws. Along with the DGCL, the certificate of incorporation and bylaws govern the internal affairs of the corporation, so if a contract contains the types of provisions that ordinarily would appear in those documents, that is a strong signal that the contract is really a governance agreement. In this case, the Challenged Provisions look like the type of class voting rights that

analysis when considering choice of law in contract disputes." (citing Restatement (Second) of Conflicts of Laws (Am. L. Inst. 1971)) (footnote omitted) (formatting removed)); *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991) ("Pursuant to Section 145 of the Second Restatement, the local law of the state which 'has the most significant relationship to the occurrence and the parties under the principles stated in § 6' will govern the rights of litigants in a tort suit." (quoting Restatement (Second) of Conflicts of Laws, *supra*, § 145)); *see also* 6 *Del. C.* § 2708 ("The parties to any contract, agreement or other undertaking, contingent or otherwise, may agree in writing that the contract, agreement or other undertaking shall be governed by or construed under the laws of this State, without regard to principles of conflict of laws, or that the laws of this State shall govern, in whole or in part, any or all of their rights, remedies, liabilities, powers and duties if the parties, either as provided by law or in the manner specified in such writing are: (1) Subject to the jurisdiction of the courts of, or arbitration in, Delaware and, (2) May be served with legal process. The foregoing shall conclusively be presumed to be a significant, material and reasonable relationship with this State and shall be enforced whether or not there are other relationships with this State.").

ordinarily would appear in a certificate of incorporation or that a board might confer on a newly created class or series established using blank check authority.[82]

A fifth consideration is that a governance agreement does not readily reveal an underlying commercial exchange. A commercial contract primarily focuses on the exchange of goods or services, with governance rights included to protect the deal. [83] The primary purpose of a governance arrangement is to allocate control rights and manage the internal operations of a corporation. Here, there was no apparent commercial exchange that led the Company to confer the Pre-Approval Requirements on Lowry. The only apparent purpose of the Stockholders Agreement was to enable Lowry to control significant decisions at the Company for as long as he and his affiliates owed at least 10% of the Company's shares.

A sixth consideration involves the duration of the contract and the corporation's ability to terminate it. Governance arrangements are more likely to be enduring, even indefinite, because the point of a governance agreement is to maintain a stable governance structure that favors the counterparty.[84] That is the case here: The Company has no ability to terminate the Stockholders Agreement, which will

---

[82] 8 *Del. C.* §§ 102(a)(4), 141(d), & 151(a) & (g).

[83] *Moelis Merits*, 311 A.3d at 858–60.

[84] *Id.* at 860, 863–66.

34

remain in effect until the Holders collectively own less than ten percent of the Company's shares.[85]

A final consideration is the presumptive remedy for breach. In a commercial agreement, the presumptive remedy is a damages award tied to the commercial deal. Under a governance arrangement, the presumptive remedy is likely to be equitable relief enforcing the underlying control rights.[86] As discussed in greater detail below, the Pre-Approval Requirements are control rights that a court likely would enforce through injunctive relief.[87]

Viewed in light of these considerations, the Stockholders Agreement is a paradigmatic governance agreement. It closely resembles the stockholder agreement at issue in the *Moelis Merits* decision, and it provides another prototype of an agreement that falls into that category.

### b.    The Improper Restriction Inquiry

Because the Stockholders Agreement forms part of the Company's entity-specific governance arrangement, Section 141(a) applies. To determine whether a provision in a governance agreement violates Section 141(a), a court uses the *Abercrombie* test.[88] The provision is invalid if it has "the effect of removing from [the]

---

[85] SA § 4.14.

[86] *Moelis Merits*, 311 A.3d at 859–60, 865.

[87] *See* Part II.C.1.b.ii.(A), *infra.*

[88] *Moelis Merits*, 311 A.3d at 860.

directors in a very substantial way their duty to use their own best judgment on management matters" or "tends to limit in a substantial way the freedom of directors' decisions on matters of management policy . . . ."[89]

The Officer Pre-Approval Requirement fails that test. It addresses a core management matter: the hiring, firing, and any other significant decision regarding senior officers. Although Section 141(a) empowers the Board to manage the corporation, "it is the rare corporation that is actually managed by the board; most corporations are managed under the direction of the board."[90] The board exercises its authority and fulfills its responsibilities "by thoughtfully appointing officers, establishing or approving goals and plans and monitoring performance."[91] Thus, "[a] primary way by which a corporate board manages a company is by exercising its independently informed judgment regarding who should conduct the company's daily business."[92] "Often it is said that a board's most important task is to hire, monitor, and fire the CEO."[93]

---

[89] *Abercrombie*, 123 A.2d at 899; *accord Quickturn II*, 721 A.2d at 1292; *Grimes II*, 673 A.2d at 1214; *see Mayer v. Adams*, 141 A.2d 458, 461 (Del. 1958) (citing *Abercrombie* with approval); *Adams v. Clearance Corp.*, 121 A.2d 302, 305 (Del. 1956) (same).

[90] J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 36 (2015) (cleaned up).

[91] *Grimes I*, 1995 WL 54441, at *8.

[92] *Gorman*, 2015 WL 4719681, at *5.

[93] *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *15 (Del. Ch. Nov. 7, 2013). *See, e.g.*, Douglas G. Baird & Robert K. Rasmussen, *The Prime Directive*, 75 U. Cin. L. Rev. 921, 923 (2007) ("The challenge of hiring and firing managers is the single most important job that directors face."); Ira M. Millstein, *The Evolution of the Certifying Board*, 48 Bus. Law.

This court has relied on Section 141(a) to invalidate provisions in nominally external agreements that nevertheless sought to control the inner workings of the corporation for purposes of officer selection. In *Gorman*, this court relied on Section 141(a) to invalidate a bylaw that allowed stockholders to remove the incumbent CEO and appoint his successor.[94] Section 142(b) expressly contemplates that bylaws can govern the selection of officers.[95] The statute further provides the terms of service can be "determined by the board of directors *or other governing body*."[96] Nevertheless, this court held a bylaw that empowered the stockholders to act as a governing body for purposes of removing and replacing the CEO conflicted with the board's managerial authority under Section 141(a). The court held that stockholders "may not directly manage the business and affairs of the corporation, at least without specific authorization in either the statute or the certificate of incorporation."[97] The

1485, 1494 (1993) ("[O]ne of the board's most important functions is to evaluate the performance of the CEO, and to replace an underperformer in a timely fashion."); *see also* Melvin Aron Eisenberg, *Legal Models of Management Structure in the Modern Corporation: Officers, Directors, and Accountants*, 63 Calif. L. Rev. 375, 403 (1975) ("[The Board] is optimally suited to . . . selecting, monitoring, and removing the members of the chief executive's office. It therefore follows that the primary objective of the legal rules governing the structure of corporate management should be to ensure effective performance of that cluster of functions . . . ." (footnote omitted)); Usha Rodrigues, *A Conflict Primacy Model of the Public Board*, 2013 U. Ill. L. Rev. 1051, 1075 (2013) ("Appointing a CEO, after all, is likely the most important decision a board will ever make.").

[94] *Gorman*, 2015 WL 4719681, at *4–6.

[95] 8 *Del. C.* § 142(b).

[96] *Id.* (emphasis added).

[97] *Gorman*, 2015 WL 4719681, at *5 (quoting *CA, Inc. v. AFSCME Empls. Pension Plan (AFSCME)*, 953 A.2d 227, 232 (Del. 2008)).

court also stated that bylaws "may not 'mandate how the board should decide specific substantive business decisions . . . .'"[98] The court concluded that giving the stockholders the right to remove officers "would unduly constrain the board's ability to manage the Company."[99]

Subsequently, in *Schroeder,* this court held that a stockholder agreement, nominally binding on the company, would be invalid under Section 141(a) if it enabled the common stockholders to select the CEO.[100] There too the court noted that the power to appoint the CEO was a core board function and that the company's bylaws empowered the board to take this action.[101]

The Officer Pre-Approval Requirement limits the Board's authority in a very substantial way. It gives Lowry, a stockholder, control over "any hiring, termination, or replacement of, or establishing the compensation or benefits payable to, or making any other significant decisions relating to the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Partnership Officer or any other senior management or key employee of [the Company] or [the LLC] . . ."[102] Without Lowry's prior written approval, the Board cannot exercise any authority over those topics. Nor

[98] *Id.* (quoting *AFCSME,* 953 A.2d at 232).

[99] *Id.* at *6.

[100] *Schroeder v. Buhannic,* 2018 WL 11264517, at *4 (Del. Ch. Jan. 10, 2018).

[101] *Id.* at *2, *4.

[102] SA § 1.01(k).

38

can the Board enter into any agreement or make any commitment with respect to any of those topics.[103]

The Officer Pre-Approval Requirement therefore has "the effect of removing from [the] directors in a very substantial way their duty to use their own best judgment" on a core management matter and "tends to limit in a substantial way the freedom of directors' decisions" on a matter management policy.[104] The provision fails the *Abercrombie* test, violates Section 141(a), and is invalid.

### i. "Just A Consent Right"

To try to save the Officer Pre-Approval Requirement, the Company offers a series of arguments. First, the Company mischaracterizes the Officer Pre-Approval Requirement as "simply . . . a contractual consent right"[105] that gives Lowry a veto "with respect to such changes that the Board first decides to make."[106]

That is plainly untrue. The Officer Pre-Approval Requirement requires Lowry's *prior* written approval. The Stockholders Agreement frames all the Pre-Approval Requirements as flat prohibitions: "Until the Substantial Ownership Requirement is no longer met, [the Company] shall not permit the occurrence of the

---

[103] SA § 1.01(l).

[104] *Abercrombie*, 123 A.2d at 899; *accord Quickturn II*, 721 A.2d at 1292; *Grimes II*, 673 A.2d at 1214; *see Mayer*, 141 A.2d at 461 (citing *Abercrombie* with approval); *Adams*, 121 A.2d at 305 (same).

[105] *See* Def.'s Opening Br. at 27.

[106] *Id.* at 15 n.8.

following matters" without Lowry's prior written approval.[107] The plain language of the Pre-Approval Requirements thus prohibits the Company from acting. The Company can only act if Lowry first gives his approval in the form of "a written resolution or consent in lieu thereof . . . ."[108]

That framework puts the Board in the same position as a management team that proposes options for a board to review and approve. With Lowry holding the Pre-Approval Requirements, the Board can only propose options. "[T]he power to review is the power to decide."[109] "If every decision of A is to be reviewed by B, then all we have really is a shift in the locus of authority from A to B."[110] Lowry has expansive power to pre-review, which gives him the power to decide.

### ii.    The "No Real Restriction" Argument

Next, the Company argues that because the nominal party to the Stockholders Agreement is the Company, the Board remains free to exercise its decision-making authority.[111] That is not true in any meaningful sense. Under current law, Lowry is highly likely to be able to obtain an injunction blocking the Company from acting

---

[107] SA § 1.01.

[108] *Id.*

[109] Stephen M. Bainbridge, *Director Primacy in Corporate Takeovers: Preliminary Reflections*, 55 Stan. L. Rev. 791, 815 (2002); *see also id.* at 807 n.92.

[110] Kenneth J. Arrow, *The Limits of Organization* 78 (1974); *accord Director Primacy, supra,* at 806–07, 815.

[111] *See* Def.'s Opening Br. at 14–17.

40

contrary to any of the Pre-Approval Requirements. In every sense, that outcome is functionally indistinguishable from preventing the Board from acting.

### (A)     The Availability Of Equitable Relief

Let's think about what would happen if the Board sought to exercise its decision-making authority, as the Company suggests. For purposes of the Officer Pre-Approval Requirement, let's assume that the Board attempts to hire, fire, or make some other significant decision regarding a senior officer, perhaps by terminating Trevor as CEO. Lowry could immediately file suit for breach of contract and seek a temporary restraining order to block the Board's decision.

To prevail on a motion for a TRO, the moving party must demonstrate that "(i) it has a colorable claim on the merits; (ii) it will suffer irreparable harm if relief is not granted; and (iii) the balance of hardships favors the moving party."[112] Of the three elements, the presence of imminent, irreparable harm is the sine qua non for the issuance of a TRO. "That element predominates because the purpose of a TRO is to preserve the status quo so that the court can conduct a fuller inquiry at a later stage of the case, typically by conducting a hearing on an application for a preliminary injunction."[113]

---

[112] *Stirling Inv. Hldgs., Inc. v. Glenoit Universal, Ltd.*, 1997 WL 74659, at *2 (Del. Ch. Feb. 12, 1997).

[113] *In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1227 (Del. Ch. 2022).

Lowry would have a lay-down hand for purposes of a colorable claim of breach. The Board would have attempted to cause the Company to do exactly what the Officer Pre-Approval Requirement prohibited. Check that one off.

For purposes of irreparable harm, Lowry again would have a lay-down hand. The Company and the Holders agreed in the Stockholders Agreement that "irreparable damage" would occur if any provision was "not performed in accordance with" its terms, and that the parties would be "entitled to specific performance of the terms hereof in addition to any other remedy to which they are entitled at law or in equity."[114] The Stockholders Agreement explicitly acknowledges the availability of equitable enforcement mechanisms, including an "injunction to prevent breaches of this Agreement" or "specific enforcement of this Agreement."[115] Under Delaware law, those stipulations are sufficient to permit the issuance of injunctive relief, although they do not force the court's hand.[116]

And Lowry would have more arrows in his quiver. Most obviously, he could rely on authority that treats the violation of a consent right as irreparable harm. Although there are cases that have denied injunctive relief when there appeared to be a readily identifiable metric for calculating an award of money damages for the

---

[114] SA § 4.13.

[115] *Id.*

[116] *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1226 (Del. 2012) ("Our courts have long held that contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing injunctive relief." (cleaned up)).

42

breach, Chief Justice Strine advised while serving on this court that "consent rights cases are better dealt with by injunctive relief if the court can act with alacrity and give the parties a reasonable period to have the negotiation or work around the consent rights."[117] For the Officer Pre-Approval Requirement, Lowry also could point out that Delaware recognizes the significance of a dispute over senior officer status by providing an expedited statutory mechanism for resolving disputes over who holds title to that office.[118] He could also point out that Delaware courts routinely issue status quo orders when resolving those disputes.[119]

Under those circumstances, the balancing of hardships would be unlikely to warrant denying a TRO. The standard approach would be to issue one and expedite the case. At the outset, therefore, Lowry would be in a position to prevent the Company (and by virtue of that same TRO, the Board) from acting.[120]

---

[117] *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2013 WL 6327997, at *19 (Del. Ch. Dec. 4, 2013) (Strine, C.); *see id.* at *1 (ruing challenge of determining "damages based on [an] admittedly imperfect attempt to discern how a hypothetical negotiation would have occurred between [the issuer] and [the investor] over the consent").

[118] *See* 8 *Del. C.* § 225.

[119] *See Arbitrium (Cayman Islands) Handels AG v. Johnson*, 1994 WL 586828, at *3 (Del. Ch. Sept. 23, 1994) ("[I]t has become customary in § 225 actions to put into place, either by agreement of the parties or court order, a *status quo* arrangement that precludes the directors presently in control of the corporation from engaging in transactions outside the ordinary course of the corporation's business until the control issue is resolved."); *see also* 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.09[f] (2d ed. 2021) (collecting authorities).

[120] *E.g.*, *Stirling*, 1997 WL 74659, at *3 (granting TRO based on allegation that threatened breach of a confidentiality provision gave the counterparty a veto over a bond issuance).

Those same realities would persist at the preliminary injunction stage. At that point, Lowry would have to show a reasonable likelihood of success on the merits, irreparable harm, and a balance of hardships that favored injunctive relief.[121] The analysis of those elements would largely track the analysis at the TRO stage. Later, those same realities would persist for any motion for summary judgment, as well as any post-trial effort by Lowry to obtain a decree of specific performance—which, to repeat, the Stockholders Agreement expressly authorizes.[122] For purposes of final relief, Lowry would not need to establish irreparable harm; he only would have to show that a remedy at law would be inadequate.[123]

Next assume that the Board resolutely refused to comply with an order enforcing the Officer Pre-Approval Requirement. The corporate veil would not protect them. A court can enforce its orders through coercive sanctions, including by holding in contempt the directors and officers who cause a corporation to fail to comply.[124]

---

[121] *COVID-Related Restrictions*, 285 A.3d at 1227.

[122] SA § 4.13.

[123] *COVID-Related Restrictions*, 285 A.3d at 1227–32.

[124] *TransPerfect Glob., Inc. v. Pincus*, 278 A.3d 630, 650 (Del. 2022) (subsequent history omitted) (recognizing that a court can impose contempt sanctions on an officer or stockholder who bears "personal responsibility for the contemptuous conduct."); *Deutsch v. ZST Digital Networks, Inc.*, 2018 WL 3005822, at *10 (Del. Ch. June 14, 2018) ("[A]n order that applies to an entity extends to directors, officers, and employees of the entity who are acting on behalf of the entity."); *accord Wilson v. United States*, 221 U.S. 361, 376 (1911) ("A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt."); *Reich v. Sea Sprite Boat Co., Inc.*, 50 F.3d 413, 417 (7th Cir.

Should it become necessary, the DGCL authorizes a court to appoint a receiver with the authority to bring the corporation into compliance.[125]

Under current law, therefore, Lowry likely can obtain equitable relief enforcing any of the Pre-Approval Requirements. When a counterparty can rely on a contract to obtain injunctive relief blocking the challenged action from taking place, and when a court can force the corporation to comply, it should be hard to claim with a straight face that the Board can exercise its authority over whether to take actions that contravene the contract.

### (B)        Efficient Breach

To deny the real-world reality of how litigation would unfold, the Company argues that if Lowry sought to exercise a Pre-Approval Requirement, then "the Board could . . . engage[] in efficient breach."[126] But efficient breach is not a contractual escape pod. A breach remains a breach, and the non-breaching party can pursue equitable remedies if money damages are an inadequate remedy.

_____

1995) (Easterbrook, J.) ("An order issued to a corporation is identical to an order issued to its officers, for incorporeal abstractions act through agents.").

[125] 8 *Del. C.* § 322 ("Whenever any corporation shall refuse, fail or neglect to obey any order or decree of any court of this State within the time fixed by the court for its observance, such refusal, failure or neglect shall be a sufficient ground for the appointment of a receiver of the corporation by the Court of Chancery. If the corporation be a foreign corporation, such refusal, failure or neglect shall be a sufficient ground for the appointment of a receiver of the assets of the corporation within this State."); *see, e.g.*, *Jafar v. Vatican Challenge 2017*, 2023 WL 3884165, at *1 (Del. Ch. June 8, 2023) (noting that court had exercised its authority to appoint receiver to bring entity into compliance with order), *aff'd sub nom. Jafar v. Moen*, 2024 WL 835257 (Del. Feb. 27, 2024).

[126] Def.'s Opening Br. at 15 n.8.

The principle of efficient breach recognizes that "properly calculated expectation damages increase economic efficiency by giving the other party an incentive to break the contract if, but only if, he gains enough from the breach that he can compensate the injured party for his losses and still retain some of the benefits from the breach."[127] "Delaware recognizes this principle of efficient breach."[128] Efficient breach thus "provides two 'paths' for a contractual promisor: perform the contract or fully compensate the promisee for non-performance." [129] Those paths do not limit the remedial paths available to the promisee. If damages will not fully compensate the promisee, or if the breach will result in irreparable harm, then the promisee can seek equitable remedies.

Those same principles apply to an agreement with a corporation. When striving to act loyally, prudently, and in good faith to maximize the value of the corporation for the benefit of its firm-specific stockholders, "directors must exercise their fiduciary duties in deciding how to proceed in the face of an agreement, understanding they are no differently situated than any other contractual counterparty."[130] That means that directors seeking to comply with the fiduciary standard of conduct could decide to engage in efficient breach. But that does not mean

---

[127] *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 445 (Del. 1996) (cleaned up).

[128] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 n.39 (Del. 2013).

[129] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 703 (Del. 2019).

[130] *Conway*, 2024 WL 1752419, at *30.

46

that the directors' fiduciary duties overrides the corporation's contractual obligations. It simply means that the directors can engage in the same type of cost-benefit analysis as any other contractual counterparty.

Directors who cause their corporation to engage in efficient breach have not freed the corporation from its contract. The breach is still a breach, and the counterparty still has its full panoply of remedies available.[131] The Company's efficient breach argument simply leads back to the question of whether Lowry could obtain injunctive relief or specific performance in the first place. As we have seen, Lowry's chances are quite good, and the concept of efficient breach doesn't hurt them.

### (C) The Severability Provision

Next, the Company asserts that a severability provision in the Stockholders Agreement means that the Board could ignore the Pre-Approval Requirements.[132] That argument misunderstands how a severability provision works.

The Stockholders Agreement does include a severability provision, and it provides as follows:

> The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision

---

[131] *See Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *24 (Del. Ch. Apr. 14, 2017) ("Just like any other decision maker, a board of directors may choose to breach if the benefits (broadly conceived) exceed the costs (again broadly conceived)."); *Orban v. Field*, 1997 WL 153831, at *9 (Del. Ch. Apr. 1, 1997) (Allen, C.) ("Certainly in some circumstances a board may elect (subject to the corporation's answering in contract damages) to repudiate a contractual obligation where to do so provides a net benefit to the corporation.").

[132] Def.'s Opening Br. at 15 n.8.

of this Agreement, or the application thereof to any person or entity or any circumstance, is found to be invalid or unenforceable in any jurisdiction, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other persons, entities or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.[133]

The Company focuses on the portion of the Severability Provision which refers to the possibility that "any provision of this Agreement, or the application thereof to any person or entity or any circumstance" could be found to be "invalid or unenforceable." The Company seems to think that this language acknowledges that a court could hold the Pre-Approval Requirements "invalid or unenforceable," but that is not the purpose of the provision. If anything, its existence favors Lowry.

A severability provision means just what is says. "A clear and unambiguous severability clause permits the Court to sever the invalid language while enforcing the remainder of the agreement that does not violate the law."[134] The Severability Provision therefore does not create a basis for invalidity; it seeks to protect against a situation in which a provision might be held invalid for another reason. In that eventuality, the Severability Provision seeks to achieve two outcomes: first, to

---

[133] SA § 4.09 (the "Severability Provision").

[134] *Suppi Constr., Inc. v. EC Devs. I, LLC*, 2024 WL 939851, at *5 (Del. Super. Mar. 4, 2024); *accord Balooshi v. GVP Global Corp.*, 2022 WL 576819, at *11 (Del. Super. Feb. 25, 2022) ("If the parties expressed in the contract directly' an unambiguous severability clause – then the Court may sever and enforce the lawful terms." (cleaned up)).

preserve the validity of the rest of the agreement, and second, to give Lowry a contractual entitlement to "a suitable and equitable" substitute provision "in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision."

For purposes of the Stockholders Agreement, the Severability Provision helps Lowry. If one of the Pre-Approval Requirements were held invalid, he could still rely on the others. He also could demand a "suitable and equitable" substitute, such as the issuance of a golden share of preferred stock carrying similar pre-approval rights.[135] The Severability Provision does not alter the Board's predicament. The

---

[135] That said, a golden share might not be able to replace all of the rights Lowry has under the Stockholders Agreement. Some of the Pre-Approval Requirements might go beyond what could be included under Sections 102(a)(4) and 151 in a certificate of designations. Even a charter provision cannot override mandatory features of the DGCL. *E.g.*, *Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *10–11 (Del. Ch. July 21, 2000) (holding that provisions in a certificate of incorporation could not specify directors in advance, provide permanent tenure for directors, or limit the right to remove directors in ways inconsistent with 8 *Del. C.* § 141(k)); *Loew's Theatres, Inc. v. Com. Credit Co.*, 243 A.2d 78, 81 (Del. Ch. 1968) (holding that a charter provision that limited the right to inspect the corporation's books and records to holders of 25% or more of the corporation's stock violated 8 *Del. C.* § 220, which gives that right to "any" stockholder). While serving on this court, Chief Justice Strine suggested that some restrictions on board action could be invalid even if they appear in the charter, referencing that charter-based limitations on the board's ability to address charter amendments or mergers could be suspect. *See Jones Apparel Gp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 852 (Del. Ch. 2004). A class-based voting right on a merger, if drafted properly, would be viable. *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

A counterparty also would not be able to secure covenants that bind the board through a preferred stock issuance. A certificate of designations can set forth "the designations and the powers, preferences and rights, and the qualifications, limitations or restrictions" of the class or series of stock that the board authorizes using blank check authority. 8 *Del. C.* § 102(a)(4). That list of features does not include imposing covenants on the board. To constrain or mandate action by the board under Section 141(a) requires a charter provision directed to the board, not a charter provision limited to the "the designations and the powers, preferences and rights, and the qualifications, limitations or restrictions" of a class or series of shares. That type of provision could appear in the original charter. It also could be implemented

---

directors remain fenced in, and the Severability Provision makes sure the fence is as high as possible.

The Stockholders Agreement primarily imposes obligations on the Company and confers rights on Lowry. The Severability Provision therefore primarily exists to protect Lowry against a potential ruling invalidating one or more of his rights and to give him a claim for substitute performance. The Severability Provision does not provide the Board with any basis to avoid an injunction, decree of specific performance, or other form of equitable relief enforcing the Pre-Approval Requirements.

### (D)   The Board's Fiduciary Duties

The Company elsewhere suggests that the directors could invoke their own fiduciary duties to avoid complying with the Pre-Approval Requirements, including the Officer Pre-Approval Requirement.[136] Under current Delaware law, that theory would be dead on arrival, because "the fiduciary status of directors does not give them Houdini-like powers to escape from valid contracts."[137]

---

through charter amendment duly approved under Section 242, or through a merger or comparable transaction where the DGCL authorizes amendments to the charter of the surviving corporation. A covenant binding the board could not be imposed through a certificate of designations. Under current law, it also cannot be imposed through a governance agreement.

[136] Def.'s Opening Br. at 18 n.10.

[137] *Frederick Hsu*, 2017 WL 1437308, at *23 (collecting authorities); *see, e.g.*, *C & J Energy Servs., Inc. v. Miami Gen. Empls.'*, 107 A.3d 1049, 1072 (Del. 2014) (instructing trial courts not to divest third parties of their contract rights absent a sufficient showing that the contract resulted from a fiduciary breach at the time of execution and that the counterparty aided and abetted the breach); *WaveDivision Hldgs., LLC v. Millennium Digital Sys., L.L.C.*,

50

The seminal authority on this issue is *Van Gorkom*. [138] In that famous case, a stockholder contended that the directors of Trans Union Corporation breached their fiduciary duties by approving a merger agreement without adequate knowledge of the corporation's alternatives. The directors argued that they acted properly because they had the right to accept a better offer at any time before the stockholder vote.[139] The Delaware Supreme Court rejected the concept of an inherent fiduciary

---

2010 WL 3706624, at *17 (Del. Ch. June 18, 2010) ("[D]espite the existence of some admittedly odd authority on the subject, it remains the case that Delaware entities are free to enter into binding contracts . . . so long as there was no breach of fiduciary duty involved when entering into the contract in the first place."); *see also In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *6 (Del. Ch. Sept. 27, 2013) (dismissing breach of fiduciary duty claim where contract prohibited actions plaintiffs claimed directors should take); *Buerger v. Apfel,* 2012 WL 893163, at *3 (Del. Ch. Mar. 15, 2012) (explaining that "[b]ecause any challenge to the initial decision to enter into the employment agreements is time-barred, the fairness analysis must take into account the contractual rights that the Apfels possess. In other words, the plaintiffs must litigate the fairness of the compensation in a world where the employment agreements validly exist and where a termination decision would have contractual consequences.").

[138] *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985). This opinion omits *Van Gorkom*'s subsequent history, which is convoluted and potentially misleading. Strict rules of citation call for identifying *Van Gorkom* as having been overruled in part by *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009). That case responded to *Van Gorkom's* loose use of the term "ratification" to refer to the effect of an organic stockholder vote contemplated by the DGCL. The *Gantler* decision limited the use of the term "ratification" to its "classic" sense, namely situations where one decision-maker has made a decision unilaterally. *Id.* at 713. Other than that narrow point of terminology, *Gantler* did not overrule *Van Gorkom* at all. Unfortunately, *Gantler*'s attempt to correct the terminology used in *Van Gorkom* created the misimpression that the case had worked a broader change in Delaware law. Subsequently, the Delaware Supreme Court confirmed that *Gantler* did not have that broader implication. *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 311 (Del. 2015). It therefore muddies the waters to cite *Gantler* as having overruled *Van Gorkom* in part, both because *Gantler* only sought to clarify a point of terminology and because *Corwin* subsequently made clear that *Gantler* did not "unsettle a long-standing body of case law." *Id.*

[139] *Van Gorkom,* 488 A.2d at 878–89.

51

termination right and looked instead at the merger agreement for language that might have permitted the directors to terminate. The only possible provision stated:

> The Board of Directors shall recommend to the stockholders of Trans Union that they approve and adopt the Merger Agreement ('the stockholders' approval') and to use its best efforts to obtain the requisite votes therefor. *[The acquirer] acknowledges that the Trans Union directors may have a competing fiduciary obligation to shareholders under certain circumstances.*[140]

The Delaware Supreme Court held that "[c]learly, this language on its face cannot be construed as incorporating . . . either the right to accept a better offer or the right to distribute proprietary information to third parties."[141] In other words, the rights the directors claimed could not be found in a cryptic acknowledgement of the Trans Union directors' "competing fiduciary obligation to shareholders under certain circumstances."[142] The contract governed.

The directors next argued that they validly amended the merger agreement to permit a "market test."[143] The Delaware Supreme Court agreed that the amendment authorized outgoing solicitation, but held that it also eliminated Trans Union's ability to terminate the merger agreement to pursue a competing offer. Contrary to the directors' belief, the amendment "imposed on Trans Union's acceptance of a third

---

[140] *Id.* at 879 (quoting merger agreement).

[141] *Id.*

[142] *Id.*

[143] *Id.* at 878.

party offer conditions more onerous than [before],"[144] "had the clear effect of locking Trans Union's Board into the Pritzker Agreement," and "foreclosed Trans Union's Board from negotiating any better 'definitive' agreement . . . ."[145] Once again, there was no inherent fiduciary power to escape the contractual commitment.

Having held that Trans Union continued to be bound by an exclusive merger agreement, the Delaware Supreme Court turned to the "legal question" of the options available to the board when the directors met three months later to ratify their prior decisions. Counsel advised that the directors had "*three* options: (1) to 'continue to recommend' the Pritzker merger; (2) to 'recommend that the stockholders vote against' the Pritzker merger; or (3) to take a noncommittal position on the merger and 'simply leave the decision to [the] shareholders."[146] The Delaware Supreme Court emphatically rejected that analysis, holding that "the Board had but two options: (1) to proceed with the merger and the stockholder meeting, with the Board's recommendation of approval; *or* (2) to rescind its agreement with Pritzker, withdraw its approval of the merger, and notify its stockholders that the proposed shareholder meeting was cancelled."[147] The second option, the Delaware Supreme Court stressed, "would have clearly involved a substantial risk—that the Board would be faced with

---

[144] *Id.* at 884.

[145] *Id.*

[146] *Id.* at 887–88 (emphasis and alteration in original).

[147] *Id.* at 888.

suit by Pritzker for breach of contract."[148] Referencing its prior holdings on the lack of any fiduciary termination right, the justices reiterated that "the Board was not free to turn down the Pritzker proposal."[149] The notion that the Trans Union board had some free-standing ability as fiduciaries to terminate the merger agreement was "contrary to the provisions of § 251(b) and basic principles of contract law . . . ."[150]

*Van Gorkom* thus made clear that if a board did not breach its fiduciary duties when entering into a contract, that contract bound the corporation. Directors did not have an inherent fiduciary right to escape or terminate a merger agreement that was not the product of a breach of fiduciary duty at the time of contracting. Decisions issued in the years immediately following *Van Gorkom* acknowledged that holding.[151]

Nearly a decade after *Van Gorkom*, the Delaware Supreme Court created a brief spell of uncertainty by failing to acknowledge the implications of that precedent in *QVC*.[152] Citing *QVC*, creative lawyers for the Company might argue that a court

---

[148] *Id.*

[149] *Id.* (internal quotation omitted).

[150] *Id.*

[151] *See Meyer v. Alco Health Servs. Corp.*, 1991 WL 5000, at *3 (Del. Ch. Jan. 17, 1991) ("The Merger Agreement in this case was negotiated at arms-length and approved by the Special Committee and a disinterested board of directors. In addition, the merger consideration was determined to be fair by an independent investment adviser. Under these circumstances, the individual defendants were not free to terminate the Merger Agreement or rewrite it to provide the guarantee plaintiff desires."); *Corwin v. DeTrey*, 1989 WL 146231, at *4 (Del. Ch. Dec. 4, 1989) ("[T]he directors of the selling corporation are not free to terminate an otherwise binding merger agreement just because they are fiduciaries and circumstances have changed.") (citing *Van Gorkom*, 488 A.2d at 888).

[152] *Paramount Commc'ns Inc. v. QVC Network Inc.* (*QVC*), 637 A.2d 34 (Del. 1994).

could impose equitable limitations on the enforceability of the Pre-Approval Requirements when applying the enhanced scrutiny standard. They might say that, but that interpretation of *QVC* has been resoundingly rejected.

In *QVC*, a merger agreement contained a suite of provisions, including a no-shop clause, that constrained the Paramount board from terminating the agreement to secure a better deal for the company's stockholders.[153] Viacom, the acquirer, responded to a challenge to the no-shop provision by arguing that it constituted a vested contract right.[154] The high court disagreed:

> The No-Shop Provision could not validly define or limit the fiduciary duties of the Paramount directors. To the extent that a contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable. Despite the arguments of Paramount and Viacom to the contrary, the Paramount directors could not contract away their fiduciary obligations. Since the No–Shop Provision was invalid, Viacom never had any vested contract rights in the provision.[155]

The decision as a whole evaluated whether it was reasonably probable that the Paramount directors breached their fiduciary duties when selling the company.[156] The high court affirmed the trial court's issuance of a preliminary injunction and

---

[153] *Id.* at 39.

[154] *Id.* at 50.

[155] *Id.* at 51 (citation omitted).

[156] *Id.* at 48–50.

expanded it to encompass the termination fee, which the trial court had not enjoined.[157]

If read broadly, the language in *QVC* to the effect that a contract provision "could not validly define or limit the fiduciary duties of the Paramount directors" might have suggested, *contra Van Gorkom*, that directors had the ability as fiduciaries to override contractual obligations (or that a court could invoke the directors' fiduciary duties to the same end). Language elsewhere in the opinion implied that the fiduciary override might come into being because of post-contracting events. For example, the opinion described the Paramount board as having a "continuing obligation" which "included the responsibility, [during a post-signing board meeting] *and thereafter*, to evaluate critically both the QVC tender offers and the Paramount–Viacom transaction."[158] The high court also remarked that after the emergence of the QVC overbid, "[u]nder *the circumstances existing at that time*, it should have been clear to the Paramount Board that the Stock Option Agreement, coupled with the Termination Fee and the No-Shop Clause, were impeding the realization of the best value reasonably available to the Paramount stockholders."[159] And in addressing the no-shop clause, the *QVC* decision distinguished between whether the provision "could validly have operated here at an early stage" and

[157] *Id.* at 37, 51.

[158] *Id.* at 49 (emphasis added).

[159] *Id.* at 50 (emphasis added).

whether it could later "prevent the Paramount directors from carrying out their fiduciary duties in considering unsolicited bids."[160] Likewise, in addressing the stock option lockup, the Court held that under "[t]he circumstances existing on November 15," the option "*had become* 'draconian.'"[161] Finally, in responding to the director defendants' argument that "they were precluded by certain contractual provisions . . . from negotiating with QVC or seeking alternatives," the *QVC* opinion stated that "[s]uch provisions . . . may not validly define or limit directors' fiduciary duties under Delaware law or prevent the Paramount directors from carrying out their fiduciary duties under Delaware law."[162]

At first blush, *QVC* might seem to conflict with, even to override *Van Gorkom*. To resolve the tension, one possible distinction might have been to posit that the application of enhanced scrutiny in *QVC* differed from the nominal application of the business judgment rule in *Van Gorkom*. Under that reading, the shift to enhanced scrutiny gave the directors a special power to escape contracts, or at least gave the courts a special power to invoke the directors' obligations on their behalf.

---

[160] *Id.* at 49 n.20.

[161] *Id.* at 50. *See also id.* at 50 n.21 (finding that the Paramount board breached its duties by not scheduling and holding an additional board meeting "shortly before the closing date [of the Viacom tender offer] in order to make a final decision, based on all of the information and circumstances then existing, whether to exempt Viacom from the Rights Agreement . . . ."); *id.* at 51 ("The directors' initial hope and expectation for a strategic alliance with Viacom was allowed to dominate their decisionmaking process to the point where the arsenal of defensive measures established at the outset was perpetuated (not modified or eliminated) *when the situation was dramatically altered.*" (emphasis added)).

[162] *Id.* at 48.

That distinction, however, could not hold water. The transaction in *Van Gorkom* was a cash deal, so if *Van Gorkom* had not pre-dated *Revlon* by sixteen months, enhanced scrutiny under *Revlon* would have applied. Moreover, the Delaware Supreme Court held in 1989 that *Revlon* applied retroactively because the doctrine was "derived from fundamental principles of corporate law" and "did not produce a seismic shift in the law governing changes of corporate control."[163] Perhaps most definitively, a broad consensus exists that *Van Gorkom* was not actually a duty of care case, but rather the Delaware Supreme Court's initial, albeit unacknowledged enhanced scrutiny case.[164]

---

[163] *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 n.2 (Del. 1989); *accord Cede & Co. v. Cinerama, Inc.*, 634 A.2d 345, 367 (Del. 1993) (applying enhanced scrutiny under *Revlon,* decided in 1986, to a merger that closed in 1982).

[164] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d. 573, 602 (Del. Ch. 2010) ("*Van Gorkom*, after all, was really a *Revlon* case." (footnotes omitted)); *Gagliardi, v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.4 (Del. Ch. 1996) (Allen, C.) ("I count [*Van Gorkom*] not as a 'negligence' or due care case involving no loyalty issues but as an early, as of its date, not yet fully rationalized '*Revlon*' or 'change of control' case."); William T. Allen, Jack B. Jacobs, & Leo E. Strine, Jr., *Realigning The Standard Of Review Of Director Due Care With Delaware Public Policy: A Critique Of* Van Gorkom *And Its Progeny As A Standard Of Review Problem*, 96 Nw. U. L. Rev. 449, 459 n.39 (2002) ("*Van Gorkom* and *Cede II* must also be viewed as part of the Delaware courts' effort to grapple with the huge increase in mergers and acquisition activity in 1980s and the new problems that posed for judicial review of director conduct. Indeed, if decided consistent with the 'enhanced scrutiny' analysis mandated by *Revlon*, with its emphasis upon immediate value maximization, rather than as a 'due care' case, *Van Gorkom* would not be viewed as remarkable." (citation omitted) (formatting added));William T. Allen, *The Corporate Director's Fiduciary Duty of Care and the Business Judgment Rule Under U.S. Corporate Law*, in COMPARATIVE CORPORATE GOVERNANCE: STATE OF THE ART AND EMERGING RESEARCH 307, 325 (Klaus J. Hopt et al. eds., 1998) ("In retrospect, [*Van Gorkom*] can be best rationalized not as a standard duty of care case, but as the first case in which the Delaware Supreme Court began to work out its new takeover jurisprudence."); Bernard Black & Reinier Kraakman, *Delaware's Takeover Law: The Uncertain Search for Hidden Value*, 96 Nw. U. L. Rev. 521, 522 (2002) ("*Van Gorkom* should be seen not as a business judgment rule case but as a takeover case that was the harbinger of the then newly emerging Delaware jurisprudence on friendly and hostile takeovers, which included the almost contemporaneous

Rather than attempting to treat enhanced scrutiny as introducing an equitable contractual override, Delaware commentators integrated *QVC* within the *Van Gorkom* framework. They stressed the inadequacies of the Paramount board's conduct at the time of contracting, cited the statement in the *QVC* decision that "[i]t is the nature of the judicial process that we decide only the case before us,"[165] and gave a charitable reading to any contrary language in the decision.[166] The same commentators emphasized the vitality of *Van Gorkom*, the inability of fiduciary duties to override contractual obligations, and the continued viability of a legal

---

*Unocal* and *Revlon* decisions.") Jonathan R. Macey & Geoffrey P. Miller, Trans Union *Reconsidered*, 98 Yale L.J. 127, 128 (1988) ("*Trans Union* is not, at bottom, a business judgment case. It is a takeover case.").

[165] *QVC*, 637 A.2d at 51.

[166] *See, e.g.*, John F. Johnston & James D. Honaker, Toys "R" Us: *An About-Face from the Deal Protection Jurisprudence that led to* Omnicare, 19 Insights, No. 12, 13, 17–18 (Dec. 2005) (describing conflicting language in *QVC* but stating that "[d]espite the *per se* rules that these passages appear to announce . . . , the opinion can be read as holding only that the failure to adequately shop the company prior to granting the protections at issue required their invalidation"); R. Franklin Balotti & A. Gilchrist Sparks, III, *Deal-Protection Measures and the Merger Recommendation*, 96 Nw. U. L. Rev. 467, 471–72 (2002) ("Although the Delaware Supreme Court's fiduciary language in *QVC* could be read to contradict the freedom-of-contract approach taken in *Van Gorkom*, commentators have reasoned that because the *QVC* could specifically limited its holding to 'the actual facts before the court,' the holding is distinguishable from *Van Gorkom*." (formatting added) (footnote omitted)); John F. Johnston, *A Rubeophobic Delaware Counsel Marks Up Fiduciary–Out Forms: Part II*, 14 Insights, No. 2, 16, 21 n.10, 22 (Feb. 2000) (interpreting *QVC* as consistent with *Van Gorkom*; explaining, "If the board is not properly informed or is otherwise in breach of its fiduciary duties at the time it agrees to tie its hands, the provision will be invalid and unenforceable. Hence, the stockholders will be protected. *See QVC*."); John F. Johnston & Frederick H. Alexander, *Fiduciary Outs and Exclusive Merger Agreements—Delaware Law and Practice*, 11 Insights No. 2, 15, 18 (Feb. 1997) ("[W]hat the [*QVC*] court found to be a breach of fiduciary duty was the perceived inadequacy of the process followed by the board in conjunction with its entering into a merger agreement with a number of provisions intended to protect the merger from other offers").

framework under which a court measures fiduciary compliance at the time of contracting, not based on post-contracting events.[167] Writing just three years after *QVC*, then-Vice Chancellor, later-Justice Jacobs (the author of the trial court opinion in *QVC*), stated flatly that "there is no Delaware case that holds that the management of a Delaware corporation has a fiduciary duty that overrides and, therefore, permits the corporation to breach, its contractual obligations."[168]

---

[167] Balotti & Sparks, *supra*, at 468–69 ("In *Smith v. Van Gorkom*, the Delaware Supreme Court established that Delaware law does not give directors, just because they are fiduciaries, the right to accept better offers, distribute information to potential new bidders, or change their recommendation with respect to a merger agreement even if circumstances have changed." (footnote omitted)); William T. Allen, *Understanding Fiduciary Outs: The What and the Why of an Anomalous Concept*, 55 Bus. Law. 653, 654 (2000) ("One of the holdings of the Delaware Supreme Court in *Smith v. Van Gorkom* was that corporate directors have no fiduciary right (as opposed to power) to breach a contract." (footnotes omitted)); John F. Johnston, *A Rubeophobic Delaware Counsel Marks Up Fiduciary-Out Forms: Part I*, 13 Insights, No. 10, 2, 2 (Nov. 1999) ("[T]he target board's compliance with its fiduciary duties [for purposes of the right to accept a superior proposal] will be measured at the time it enters into the agreement."); John F. Johnston, *Recent Amendments to the Merger Sections of the DGCL Will Eliminate Some—But Not All—Fiduciary Out Negotiation and Drafting Issues*, 1 Mergers & Acquisitions L. Rep. 20, 777, 778 (July 20, 1998) (BNA) ("[T]here is . . . no public policy that permits fiduciaries to terminate an otherwise binding agreement because a better deal has come along, or circumstances have changed."); *id.* at 779 ("[I]n freedom-of-contract jurisdictions like Delaware, the target board will be held to its bargain (and the bidder will have the benefit of its bargain) only if the initial agreement to limit the target board's discretion can withstand scrutiny under applicable fiduciary duty principles"); Johnston & Alexander, *supra*, at 15 (explaining that in *Van Gorkom*, "the Delaware Supreme Court held that directors of Delaware corporations may not rely on their status as fiduciaries as a basis for (1) terminating a merger agreement due to changed circumstances, including a better offer; or (2) negotiating with other bidders in order to develop a competing offer."); A. Gilchrist Sparks, III, *Merger Agreements Under Delaware Law—When Can Directors Change Their Minds?*, 51 U. Miami L. Rev. 815, 817 (1997) ("[*Van Gorkom*] makes it clear that under Delaware law there is no implied fiduciary out or trump card permitting a board to terminate a merger agreement before it is sent to a stockholder vote.").

[168] *Halifax Fund, L.P. v. Response USA, Inc.*, 1997 WL 33173241, at \*2 (Del. Ch. May 13, 1997).

To the extent there might have been any lingering uncertainty about the ability of a court to rely on directors' fiduciary duties to limit the effectiveness of contracts, the Delaware Supreme Court's decision in *C & J Energy* eliminated it. There, the Court of Chancery enjoined the enforcement of the no-shop provision in a merger agreement that resulted from a management-led, single-bidder process in which the combined entity would have a controlling stockholder, but the target company viewed itself as the acquirer and therefore its board did not make any effort to explore strategic alternatives.[169] The Delaware Supreme Court vacated the injunction on multiple grounds, including the primacy of the bidder's contract rights. The court explained that even in a setting where enhanced scrutiny applied,

> [s]uch an injunction cannot strip an innocent third party of its contractual rights while simultaneously binding that party to consummate the transaction. To blue-pencil a contract as the Court of Chancery did here is not an appropriate exercise of equitable authority in a preliminary injunction order. That is especially true because the Court of Chancery made no finding that Nabors had aided and abetted any breach of fiduciary duty, and the Court of Chancery could not even find that it was reasonably likely such a breach by C & J's board would be found after trial.[170]

Later in the decision, the Delaware Supreme Court reiterated that "a judicial decision holding a party to its contractual obligations while stripping it of bargained-for benefits should only be undertaken on the basis that the party ordered to perform was fairly required to do so, because it had, for example, aided and abetted a breach

---

[169] *C & J Energy*, 107 A.3d at 1052–53.

[170] *Id.* at 1054 (footnote omitted).

of fiduciary duty."[171] That language indicated that establishing a sell-side breach of fiduciary duty at the time of contracting is not enough, standing alone, to warrant equitable relief overriding the counterparty's contract rights. Instead, the court must find that the counterparty aided and abetted the sell-side breach. After *C & J Energy*, no one could think that the application of enhanced scrutiny, standing alone, would give a Delaware court the power to impose equitable limitations on the enforceability of a contract.

Those legal principles doom any effort to invoke fiduciary duties as a basis to escape from the Officer Pre-Approval Requirements. The *Hokanson v Petty*[172] decision shows how a court would likely analyze the issue. There, a board of directors entered into a securities purchase agreement under which the buyer acquired preferred stock in the corporation and was granted the right to force the corporation into a future go-private transaction at a price determined by a contractual formula.[173] The agreement left the form of the go-private transaction to the buyer's "sole discretion."[174] The board granted the buyer that right in 2003, and in 2007, the buyer exercised it and specified that the acquisition would take place via merger.[175] The contractually determined

---

[171] *Id.* at 1072.

[172] 2008 WL 5169633 (Del. Ch. Dec. 10, 2008).

[173] *Id.* at *2.

[174] *Id.*

[175] *Id.* at *4.

consideration partially satisfied the preferred stockholders' liquidation preferences and left the common stockholders with nothing. Stockholder plaintiffs sued, asserting that the board could not simply permit the buyer to enforce the agreement, but rather had a fiduciary duty to seek superior alternatives, including by negotiating for a higher buyout price. The plaintiffs conceded that any attempt to challenge the validity of the 2003 agreement was time-barred.[176]

Chief Justice Strine, then serving as a Vice Chancellor, held that "[t]he change of control occurred in 2003" and that "the material decisions about the transaction, including the price and transaction form," were made then.[177] Consequently, "all that was left to do in 2007 when [the buyer] decided to exercise its Buyout Option was apply the Contract Price Formula, sign the documents necessary to effect [the buyer's] chosen transaction form, and distribute the purchase money . . . ."[178] The board had no special fiduciary ability to avoid the corporation's contractual obligations or their enforcement. The corporation "was contractually obligated to enter into the Merger, and [its] board could not fail to do so without causing the company to dishonor a contract."[179] The plaintiffs' assertion that the directors

---

[176] *Id.*

[177] *Id.* at *5.

[178] *Id.*

[179] *Id.* at *6.

breached their fiduciary duties by not pursuing an efficient breach of contract could not overcome the business judgment rule.[180]

Delaware cases thus demonstrate overwhelmingly that a court cannot invoke the fiduciary duties of directors to override a counterparty's contract rights. That is true even when a heightened standard of review like enhanced scrutiny applies. Under current Delaware law, any attempt by the Company to invoke its directors' duties to defeat Lowry's exercise of the Officer Pre-Approval Requirement would have to overcome a multi-decade wall of precedent.

### (E)     Lowry's Obligations Under The Implied Covenant Of Good Faith And Fair Dealing

Without any contractual or fiduciary hook on the Company's side, the Company shifts its attention to Lowry. According to the Company, if Lowry tried to exercise one of the Pre-Approval Requirements, then the Company could invoke the implied covenant of good faith and fair dealing to prevent Lowry from exercising his pre-approval right in bad faith.[181] In theory, that is true, but the Company would have to prove that Lowry was exercising the Pre-Approval Requirement to harm the corporation in a manner not contemplated by the Stockholders Agreement, rather than for its intended purpose.[182]

---

[180] *Id.* at *7–8.

[181] Def.'s Op. Br. at 17.

[182] *See ArchKey Intermediate Hldgs. Inc. v. Mona*, 302 A.3d 975, 1004–05 (Del. Ch. 2023) (describing that potential claim).

Under Delaware law, a claim under the implied covenant is difficult to prove. The Delaware Supreme Court has summarized the implied covenant concisely as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.[183]

To prevail on an implied covenant claim, a plaintiff must prove "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[184]

When determining whether to invoke the implied covenant, a court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."[185] "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill."[186] The court must determine whether a gap

---

[183] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (cleaned up).

[184] *Cantor Fitzgerald, L.P. v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

[185] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE).

[186] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014).

exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right."[187] "[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue."[188]

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled."[189] One reason a gap might exist is if the parties negotiated over a term and rejected it. Under that scenario, the implied covenant should not be used to fill the gap left by a rejected term because doing so would grant a contractual right or protection that the party "failed to secure . . . at the bargaining table."[190]

But contractual gaps may exist for other reasons. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency."[191] "In only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all

---

[187] *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010).

[188] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE).

[189] *Allen*, 113 A.3d at 183.

[190] *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004).

[191] *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008).

possible future states of the world would be prohibitive, if it were cognitively possible."[192]

Equally important, "parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations."[193] "The implied covenant is well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement."[194]

Applying these principles, the Delaware Supreme Court has made clear that the implied covenant of good faith and fair dealing restrains a party's exercise of discretion under an agreement. The general rule is that the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. That rule operates with special force "when a contract confers discretion on a party."[195] At a minimum, the implied covenant

---

[192] *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.).

[193] *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting *Corbin on Contracts* § 570, at 601 (Kaufman Supp. 1984)).

[194] *Dieckman*, 155 A.3d at 361.

[195] *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021).

requires that the party empowered with the discretion to make a determination "use good faith in making that determination."[196]

Those standards mean that for purposes of the Pre-Approval Requirements, the Company would have to show that Lowry was not withholding his pre-approval for a rational reason. A claim that Lowry withheld his pre-approval for spite might succeed.[197] So might a claim that Lowry knew the action the Board sought to take was in the best interests of the Company, knew the action would not harm his own interests, but nevertheless withheld his pre-approval to extract some other, unrelated benefit from the Company.

Absent extreme facts of that sort, the implied covenant will not come into play.[198] If, for example, the Board thought the Company needed a new CEO, but Lowry believed in good faith that Trevor was the best person for the job, then Lowry could withhold his pre-approval without violating the implied covenant. The potential existence of an implied covenant claim under extreme circumstances does not re-establish the Board's authority to the degree necessary to rectify the Section 141(a) violation.

---

[196] *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990).

[197] *See Seinfeld: The Wig Master* (NBC television broadcast Apr. 4, 1996).

[198] *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *7 (Del. Ch. Aug. 25, 2006) (dismissing implied covenant claim based on stockholder's exercise of contractual consent right over the declaration of a dividend).

### (F)     Lowry's Fiduciary Duties

The other potential hook for preventing Lowry from exercising one of the Pre-Approval Requirements might be Lowry's own fiduciary duties. Perhaps, but here again, the Company would face an uphill climb.

Lowry's first line of defense would be to argue that he was not a controlling stockholder. One line of Delaware cases refuses to consider contractual rights when assessing controller status.[199] Lowry could argue with a straight face that given his level of equity ownership, he would not owe fiduciary duties as a controller. Lowry also could argue that when exercising an individual pre-approval right, he was not acting as a controller.[200]

Lowry's next line of defense would be to argue that even if he was a controlling stockholder, he did not owe fiduciary obligations when exercising contract rights. A series of Delaware decisions assert that a fiduciary does not owe fiduciary duties

---

[199] *See, e.g., In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 995 (Del. Ch. 2014*)* ("Here, there are no well-pled facts from which it is reasonable to infer that KKR could prevent the KFN board from freely exercising its independent judgment in considering the proposed merger or, put differently, that KKR had the power to exact retribution by removing the KFN directors from their offices if they did not bend to KKR's will in their consideration of the proposed merger."), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[200] *Superior Vision*, 2006 WL 2521426, at *5 (rejecting argument that contractual consent right over the declaration of a dividend gave the holder sufficient control to trigger fiduciary review).

when exercising contractual rights, even if the counterparty is the fiduciary's beneficiary.[201]

Lowry's third line of defense would be to argue that even if he was a controlling stockholder and owed fiduciary obligations when exercising contract rights, those duties did not require that he engage in self-sacrifice. Delaware decisions have repeatedly acknowledged that when parties have bargained for contractual provisions, they can rely on them.[202]

In response, the directors would have to assert that Lowry owed fiduciary duties, including when exercising contract rights. I recently surveyed Delaware authorities and concluded that when exercising voting rights, a controller owes a limited set of fiduciary duties under which the controller cannot knowingly or intentionally harm the controlled corporation or do so as a result of gross negligence (recklessness).[203] Because voting rights are contractual, the same conceptual framework logically would apply to a controller's exercise of contract rights.

---

[201] *See, e.g., Odyssey P'rs, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 415 (Del. Ch. 1999) ("Chancellor Allen found that Fleming was not constrained by fiduciary duties when acting as a creditor in relation to the foreclosure sale. . . . In my view, this rationale applies with equal force both to the claim that Fleming was obligated to pay a fair price in the foreclosure sale and that it (or Lawson) was obliged to disclose to ABCO's directors its analyses of ABCO's value to it. Fleming was not acting in a fiduciary capacity when it bid at the foreclosure sale and, thus, its conduct thereat is not subject to a fiduciary duty analysis."); *Superior Vision*, 2006 WL 2521426 at *5 ("Here, ReliaStar is alleged to have taken advantage of its contractual rights for its own purposes. Without more, that is not sufficient to allege that ReliaStar is a 'controlling shareholder' bound by fiduciary obligations.").

[202] *E.g., In re Sirius XM*, 2013 WL 5411268, at *2.

[203] *In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 512 (Del. Ch. 2024).

Except for the addition of potential liability for recklessness, that legal framework is not materially different than what contract law would enforce using the implied covenant. As discussed previously, except under extreme circumstances, the implied covenant would not constrain Lowry's reliance on the Officer Pre-Approval Requirement.

Under current Delaware law, therefore, a daunting array of impediments would stand between the Company and any ability to rely on Lowry's duties as a controlling stockholder to limit the enforcement of the Pre-Approval Requirements. Might the Company pull it off under extreme circumstances? Possibly. But the Company would not start out with aces and kings. More like a pair of eights.

### (G) Breaches Of Fiduciary Duty At The Time of Contracting

As a final effort, the Company might hearken back to the time of contracting. As noted previously, Delaware decisions consistently take the position that unless a contract resulted from a breach of duty, and unless (per *C & J Energy*) the counterparty aided and abetted that breach, then the counterparty can enforce its rights. The Company might conceivably try to defang a Pre-Approval Requirement by arguing that Lowry breached his fiduciary duties when entering into it.

That would be another tough sell. The directors would not be arguing that the Pre-Approval Requirements were void under Section 141(a); they would be arguing that equity should invalidate the Stockholders Agreement based on breaches of fiduciary duty at the time of contracting. Equitable defenses like laches and various forms of estoppel would apply. For the Stockholders Agreement, the analysis would

71

not have to move beyond laches, given that the directors entered into the Stockholders Agreement in October 2019, more than three years ago.[204]

The directors' argument would also face another hurdle: The Delaware Supreme Court has held that directors do not owe fiduciary duties to future stockholders and, based on that principle, held that directors who caused a company to enter into a loan agreement before a spinoff owed no duties to the public stockholders who later received shares in the spinoff.[205] Applied to this case, that would imply that the directors did not owe any fiduciary duties to the public stockholders when they entered into the Stockholders Agreement. Even a time-of-contracting argument likely goes nowhere.

### iii.    Summing Up

As the preceding discussion shows, the Company would have no meaningful way to defeat the exercise of the Pre-Approval Requirements, including the Officer Pre-Approval Requirement. That is why the Officer Pre-Approval Requirement constitutes a Section 141(a) violation.

---

[204] *See, e.g., Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 768 (Del. 2013) ("It is uncontroverted that Levey's claim sounds in contract, and that the analogous statute of limitations is 10 *Del. C.* § 8106, under which a breach of contract action must be brought within three years from the date that the cause of action accrued."); s*ee also In re Sirius XM*, 2013 WL 5411268, at *2 (relying on laches to dismiss claim that contract could not prevent a board from adopting a stockholder rights plan).

[205] *See Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1177 (Del. 1988) (no fiduciary relationship between directors and future stockholders).

## 2.      The Section 142 Challenge

The plaintiff separately contends that the Officer Pre-Approval Requirement violates Section 142(b) and (e). Section 142(b) states: "Officers shall be chosen in such manner and shall hold their offices for such terms as are prescribed by the bylaws or determined by the board of directors or other governing body."[206] Section 142(e) states: "Any vacancy occurring in any office of the corporation by death, resignation, removal or otherwise, shall be filled as the bylaws provide. In the absence of such provision, the vacancy shall be filled by the board of directors or other governing body."[207]

By virtue of Section 102(b)(1), any provision that can appear in a bylaw can also appear in the certificate of incorporation (although not *vice versa*),[208] so a certificate of incorporation could also specify how officers shall be chosen. In this way, Section 142(b) and (e) operate as bylaw includers, making clear that the bylaws—and not just the certificate of incorporation—can also address those issues. Notably, Section 142(b) does not authorize a stockholders agreement to determine how officers are chosen or removed, nor how vacancies are filled.

In this case, neither the Charter nor the Bylaws authorizes the Officer Pre-Approval Requirement. Echoing Section 141(a), the Charter states that that "[t]he

---

[206] 8 *Del. C.* § 142(b).

[207] 8 *Del. C.* § 142(e).

[208] 8 *Del. C.* § 102(b)(1).

business and affairs of the Corporation shall be managed by, or under the direction of, the Board."[209] The Charter thus reinforces the Company's board-centric governance structure and the expectation that the Board will exercise the full authority it possesses under Section 141(a), including over the selection and removal of officers.

The Bylaws are more specific. They state that

> [t]he Board may from time to time elect officers of the Corporation, which may include a Chairman, Chief Executive Officer, President, Vice Presidents, Secretary, Treasurer and any other officers as it may deem proper or may delegate to any elected officer of the Corporation the power to appoint and remove any such officers and to prescribe their respective terms of office, authorities and duties.[210]

The Bylaws also give the Board the power to remove officers, stating that "[a]ny officer may be removed at any time with or without cause by the Board or, in the case of appointed officers, by any elected officer upon whom such power of removal shall have been conferred by the Board."[211] The Bylaws thus implement the Company's board-centric governance structure by providing the Board with full authority over the selection and removal of officers.

Nothing in Section 142, the Charter, or the Bylaws empowers a contractual counterparty to control the hiring, firing, or the making of significant decisions regarding senior officers. This decision need not address whether the Charter or the

[209] Charter § 7.1(i).

[210] Bylaws, § 5.01.

[211] *Id.* § 5.02.

Bylaws could empower a contractual counterparty to control those matters, because nothing in the Charter or Bylaws purports to allow it. The Officer Pre-Approval Requirement therefore conflicts with section 142(b) and (e). For this additional reason, the Officer Pre-Approval Requirement is invalid.

## D.    The Charter Pre-Approval Requirement

The plaintiff next challenges the Charter Pre-Approval Requirement, which requires Lowry's prior written approval before the Company can commit to, make any agreement regarding, or permit the occurrence of "any amendments to the certificate of incorporation . . . of the Company."[212] That provision is also invalid for two separate reasons. It violates Section 141(a), and it violates Section 242.[213]

### 1.    The Section 141(a) Challenge

The plaintiff contends that the Charter Pre-Approval Requirement violates Section 141(a) of the DGCL to the extent it requires Lowry's prior written approval before the Company can enter into any agreement regarding, make any commitment regarding, or effectuate a charter amendment. This decision has already determined

---

[212] SA § 1.01(c).

[213] The plaintiff separately argues that the Charter Pre-Approval Requirement violates Section 212(a) of the DGCL. That section states that "[u]nless otherwise provided in the certificate of incorporation and subject to § 213 of this title, each stockholder shall be entitled to 1 vote for each share of capital stock held by such stockholder." 8 *Del. C.* § 212(a). The plaintiff observes that the Holders are stockholders and that the Charter Pre-Approval Requirement gives them a veto over any charter amendment. The plaintiff contends that the Charter Pre-Approval Requirement functionally provides each Holder with sufficient votes to defeat any charter amendment, resulting in the Holders having more than one vote per share without that entitlement appearing in the charter. Because the Charter Pre-Approval Requirement is invalid for other reasons, this decision does not consider that argument.

that the Pre-Approval Requirements appear in a governance agreement and are subject to Section 141.[214] The only question is whether the Charter Pre-Approval Requirement has "the effect of removing from [the] directors in a very substantial way their duty to use their own best judgment on management matters" or "tends to limit in a substantial way the freedom of director decisions on matters of management policy."[215]

After a corporation has issued stock, the DGCL empowers the board to determine whether a corporation will amend its charter.[216] Only the board has the authority to initiate that process. The board likewise has the power to decline to initiate that process. Under the DGCL, the board is the gatekeeper for charter amendments. The board's authority over that topic is a matter of management policy.

With that issue addressed, it becomes easy to conclude that the Charter Pre-Approval Requirement tends to remove from the directors in a very substantial way their ability to use their own best judgment over whether to present a charter amendment. In a series of opinions, this court has held that contract provisions that inserted other parties as gatekeepers for significant board decisions resulted in a violation of Section 141(a).

---

[214] *See* Part II.C.1.a, *supra*.

[215] *Abercrombie*, 123 A.2d at 899; *accord Quickturn II*, 721 A.2d at 1292; *Grimes II*, 673 A.2d at 1214; *see Mayer*, 141 A.2d at 461 (citing *Abercrombie* with approval); *Adams*, 121 A.2d at 305 (same).

[216] 8 *Del. C.* § 242(a).

For example, in *ACE*, a target corporation entered into a merger agreement that prohibited the board from talking to other potential acquirers unless outside counsel opined that the board's fiduciary duties required engagement.[217] While serving on this court, Chief Justice Strine held that provision was "likely invalid" because it involved "involves an abdication by the board of its duty to determine what its own fiduciary obligations require at precisely that time in the life of the company when the board's own judgment is most important."[218]

While serving on this court, Justice Berger reached a similar conclusion in *Jackson v. Turnbull*.[219] There, the board of directors set a floor price for a merger but left the final determination of the price to a valuation firm.[220] Then-Vice Chancellor Berger held that by giving up that authority to the valuation firm, the board violated Section 141(a) by binding itself to the valuation firm's determination. The provision was therefore invalid.[221] Chief Justice Strine reasoned similarly and to the same effect in *Nagy*.[222]

---

[217] *ACE*, 747 A.2d at 96–102.

[218] *Id.* at 97, 106.

[219] 1994 WL 174668 (Del. Ch. Feb. 8, 1994), *aff'd*, 653 A.2d 306 (Del. 1994) (TABLE).

[220] *Id.* at *5.

[221] *Id.*

[222] *Nagy v. Bistricer*, 770 A.2d 43, 46, 60–62 (Del. Ch. 2000).

Two earlier decisions applied the same principles. In *Clarke*, a board authorized a corporation to explore selling all of its assets.[223] But rather than determining whether to sell the corporation's assets or setting terms for the sale, the board authorized its President and Secretary to determine whether to sell and on what terms, as long as they secured a value in excess of a minimum price.[224] The court granted judgment on the pleadings for the plaintiff, finding the resolution improperly bound the board to accept the officers' determination, when "what the officers deem to be in the best interest of the Corporation is not necessarily what the Board of Directors may decide is in its best interest."[225]

Finally, in *Field*, a board approved an agreement to issue stock to a third party in exchange for the third party's shares.[226] The board directed an appraiser to determine the exchange ratio, subject to a cap.[227] Chancellor Seitz, then serving as a Vice Chancellor, held that "the directors of a Delaware corporation may not delegate, except in such manner as may be explicitly provided by statute, the duty to determine the value of the property acquired as consideration for the issuance of stock."[228] The

---

[223] *Clarke Mem'l Coll. v. Monaghan Land Co.*, 257 A.2d 234, 237 (Del. Ch. 1969).

[224] *Clarke,* 257 A.2d at 240–41.

[225] *Id.* at 241.

[226] *Field v. Carlisle Corp.*, 68 A.2d 817, 817 (Del. Ch. 1949).

[227] *Id.* at 818.

[228] *Id.* at 820. The General Assembly responded by amending Section 151(a). The statute now makes clear that a board can set the consideration for a stock issuance by

corporation argued that the directors acted properly by setting an upper bound, but Chancellor Seitz held that the directors must have the final say.[229] The appraisal provision violated Section 141(a) because "the directors bound their corporation even before seeing the appraisal . . . ."[230]

The Charter Pre-Approval Requirement limits the Board's ability to proceed with a charter amendment to an even greater degree. Through that provision, the Board contractually designated Lowry as the gatekeeper for whether the Company can amend its charter. Without Lowry's prior written approval, the Board cannot proceed. That limitation does not appear in the Charter, and it therefore violates Section 141(a).[231]

### 2. The Section 242 Challenge

The Charter Pre-Approval Requirement is also invalid for a separate and independent reason. Section 242 of the DGCL governs charter amendments after a corporation has issued stock. Under Section 242, effectuating a charter amendment requires two steps that must occur in order. First, the board of directors must adopt a resolution declaring the advisability of the amendment and calling for a stockholder

---

referring to "facts ascertainable" outside the resolution approving the issuance. *See* 8 *Del. C.* § 151(a).

[229] *Id.* at 820–21.

[230] *Id.*

[231] The Company advances the same arguments it proffered in defense of the Officer Pre-Approval Requirement. Those arguments fail for the same reasons.

vote. Second, a majority of the outstanding stock entitled to vote must vote in favor.[232] Those "two discrete corporate events must occur, in precise sequence" for the amendment to be effective.[233] Under this statutory sequence, "[t]he stockholders may not act without prior board action."[234]

The Charter Pre-Approval Requirement displaces the statutory sequence by putting Lowry at the head of the line. That violates the order established by Section 242.[235]

Importantly, the Charter Pre-Approval Requirement is not an additional vote that the corporation must obtain before a transaction can close. Transaction agreements often provide for additional votes, such as by requiring that a transaction can only close if, in addition to the statutorily required vote, it also receives approval from a majority of the unaffiliated shares. The Charter Pre-Approval Requirement does not call for a specific additional vote as an additional requirement at the end of the line. The Charter Pre-Approval Requirement purports to introduce a threshold

---

[232] 8 *Del. C.* § 242(b)(1).

[233] *Williams v. Geier*, 671 A.2d 1368, 1381 (Del. 1996).

[234] *Id.*

[235] *See Blades v. Wisehart*, 2010 WL 4638603, at *11 n.91 (Del. Ch. Nov. 17, 2010) *superseded by statute on other grounds*, 2023 Del. Laws Ch. 98 (S.B. 114), *as recognized in Holifield*, 304 A.3d at 931 n. 177; *iXCore, S.A.S. v. Triton Imaging, Inc.*, 2005 WL 1653942, at *1 n.7 (Del. Ch. July 8, 2005); *Tansey v. Trade Show News Networks, Inc.*, 2001 WL 1526306, at *4 (Del. Ch. Nov. 27, 2001).

requirement before the statutory mechanism can proceed. That mechanism violates Section 242.

## E.     The Transaction Pre-Approval Requirement

The last Challenged Provision is the Transaction Pre-Approval Requirement. It requires Lowry's prior written approval before the Board can make any commitment as to, approve any agreement regarding, or permit the occurrence of any transaction,

> resulting in the merger, consolidation or sale of all, or substantially all, of the assets of [the LLC] and its subsidiaries [or] any dissolution, liquidation or reorganization (including filing for bankruptcy) of [the LLC] and its subsidiaries or any acquisition or disposition of any asset for consideration in excess of 5% of the Total Assets (as defined below) of [the Company] and its subsidiaries.[236]

That provision also seeks to regulate core areas of board power.

The plaintiff nominally challenged the Transaction Pre-Approval Requirement as a restriction on the Company's ability to engage in a merger or other change-of-control transaction. The plaintiff argued that granting Lowry a pre-approval right over Company-level mergers conflicted with both Section 141(a) and Section 251 of the DGCL. But as the Company correctly pointed out, the Transaction Pre-Approval Requirement does not constrain the Company's ability to merge. It primarily governs transactions involving the LLC, which is the Company's sole operating subsidiary.[237]

---

[236] SA § 1.01(a).

[237] Def.'s Opening. Br. at 23 n.15.

At the Company level, the provision only addresses "any acquisition or disposition of any asset for consideration in excess of 5% of the Total Assets . . . ."[238]

After pointing out this defect in the plaintiff's position, the Company nevertheless chose to defend the plaintiff's arguments on the merits. As to the plaintiff's Section 251 argument, however, the absence of a Pre-Approval Requirement governing Company-level mergers is fatal. If such a pre-approval right existed, then the analysis would track the conflict between the Charter Pre-Approval Requirement and Section 242. But a pre-approval requirement for Company-level mergers does not exist.

The question that the Transaction Pre-Approval Requirement presents is whether making Lowry the gatekeeper over (i) transactions at the LLC level and (ii) any acquisition or disposition of any asset for consideration in excess of 5% of the Total Assets of the Company violates Section 141(a). Those limitations would give Lowry control over whether the Company engaged in a sales of all or substantially all of the Company's assets, where the operative DGCL provision has the same structure as Section 242.[239]

---

[238] *Id.*

[239] *Compare* 8 *Del. C.* § 271(a) & (b) *with* 8 *Del. C.* § 275(a) & (b) *with* 8 *Del. C.* § 251(b) & (c). Dissolution can be achieved unilaterally, without board involvement, by unanimous stockholder written consent. *Id.* § 275(c). A stockholder agreement could bind stockholders to vote on a unanimous dissolution. That path is irrelevant to limitations on the board's authority to implement dissolution.

More generally, this provision allows Lowry to determine whether the Company will engage in a broad range of material transactions, neutering the traditional prerogative of the Board to make those decisions. By addressing such a broad swathe of decisions regarding the Company's sole operating subsidiary, the Transaction Pre-Approval Requirement restricts the Board's ability to manage the business and affairs of the Company. Any restriction to that effect must appear in the Charter. The attempt to impose it through the Stockholders Agreement contravenes Section 141(a).

## F.     The Propriety Of The Plaintiff's Facial Challenge

The plaintiff has framed its motion as a facial challenge to the Challenged Provisions. The Company maintains that a facial challenge is unsupportable. To the contrary, a facial challenge is the proper vehicle to test the validity of the Challenged Provisions. "Facial challenges to the legality of provisions in corporate instruments are regularly resolved by this Court."[240]

The Delaware Supreme Court has stated that to succeed on a facial challenge, the plaintiff must show that that a challenged provision cannot operate lawfully "*under any circumstances*."[241] Here, that standard is readily met.

---

[240] *Lions Gate Ent. Corp. v. Image Ent. Inc.*, 2006 WL 1668051, at \*6 (Del. Ch. June 5, 2006); *see, e.g.*, *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 938 (Del. Ch. 2013) (ruling on facial validity of bylaw); *Sagusa, Inc. v. Magellan Petroleum Corp.*, 1993 WL 512487, at \*1 (Del. Ch. Dec. 1, 1993) (ruling on facial validity of per captia voting provision).

[241] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 113 (Del. 2020). The *Salzberg* court drew this standard from the *Chevron* case. *See Chevron*, 73 A.3d at 948. The *Chevron* decision cited *Frantz*, but the *Frantz* case does not say that; it says: "The bylaws of a corporation are

presumed to be valid, and the courts will construe the bylaws in a manner consistent with the law rather than strike down the bylaws." *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 407 (Del. 1985). That is a similar proposition, but it addresses how a court construes a bylaw, not when a facial challenge can succeed. The *Chevron* court later cited *Stroud*, but the same admonition applies. *See Stroud v Grace*, 606 A.2d 75, 78–79 (Del. 1992) (cited in *Chevron*, 73 A.3d at 949 n.56). The real source of the *Chevron* standard appears to be *United States v. Salerno*, 481 U.S. 739 (1987), which the *Chevron* decision cited as being in accord with a Delaware Family Court case that had cited *Salerno* for that proposition. *See Chevron*, 73 A.3d at 948 n.55 (first citing *R.M. v. V.H.*, 2006 WL 1389864, at *8 (Del. Fam. Ct. Jan. 19, 2006) ("A party may challenge a statute as unconstitutional on its face or as applied to a particular set of facts. A facial challenge is the most difficult to bring successfully because the challenger must establish that there is no set of circumstances under which the statute would be valid."), then citing *Salerno*, 481 U.S. at 745 (describing a facial challenge as the "most difficult" challenge to succeed on because the statute must not operate lawfully in any circumstances)).

Considerable judicial and scholarly debate exists over the *Salerno* standard. *E.g.*, Catherine Gage O'Grady, *The Role of Speculation in Facial Challenges*, 53 Ariz. L. Rev. 867, 875 (2011) ("Although the Court has relied extensively on the *Salerno* test to analyze facial challenges, the standard has been controversial and criticized by some Justices as nearly impossible to satisfy. Recently, the Roberts Court suggested that to succeed in a facial attack a challenger must establish either that no set of circumstances exists under which the statute would be valid, or that the statute lacked any 'plainly legitimate sweep.'") (footnotes omitted) (citing United States v. Stevens, 559 U.S. 460, 472 (2010)); David L. Franklin, *Facial Challenges, Legislative Purpose, and the Commerce Clause*, 92 Iowa L. Rev. 41, 62 (2006) ("Scholars agree that facial adjudication occurs more frequently than the Supreme Court's stingy, and ostensibly broadly applicable, test in *Salerno* would indicate."); Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1321 (2000) ("Both within the Supreme Court and among scholarly commentators, a debate rages over when litigants should be able to challenge statutes as 'facially' invalid, rather than merely invalid 'as applied.' To a large extent, this debate reflects mistaken assumptions. There is no single distinctive category of facial, as opposed to as-applied, litigation. All challenges to statutes arise when a litigant claims that a statute cannot be enforced against her. In the course of as-applied litigation, rulings of facial invalidity sometimes occur, but they do not reflect trans-substantive rules governing a purported general category of facial challenges. Rather, rulings that a statute is facially (or partly) invalid are the consequence of the particular doctrinal tests that courts apply to resolve particular cases. Some doctrinal tests call for statutes to be tested on their faces, whereas others do not. Accordingly, debates about the permissibility of facial challenges should be recast as debates about the substantive tests that should be applied to enforce particular constitutional provisions."); Marc E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement*, 48 Am. U. L. Rev. 359, 397 (1998) (defending *Salerno* while arguing that the "any circumstances" standard was "not a facial challenge test for overbreadth facial challenges, and indeed not a facial challenge 'test' at all"); Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 294 (1994) (arguing that the *Salerno* standard "finds little support in the Supreme Court's cases and is unsound in principle"). *Chevron* introduced the

For purposes of the Section 141(a) challenge, the standard is met because of how the Challenged Provisions operate. If Lowry and the Board agree on a course of action, the Challenged Provisions do not operate at all, precisely because everyone agrees. Lowry only has the need to invoke one of the Challenged Provisions if the Board wants to commit to, agree on, or permit the Company to pursue a course of action with which Lowry disagrees. Consequently, every setting in which Lowry relies on one of the Challenged Provisions will constitute a violation of Section 141(a). Thus, the Challenged Provisions are facially invalid.

For purposes of the Section 142 challenge to the Officer Pre-Approval Requirement, the standard is again met. Sections 142(a) and (e) do not contemplate a contract that would authorize a third party to control the selection of officers. The Company's Charter and Bylaws give that authority to the Board. Under current law, the Officer Pre-Approval Requirement cannot operate consistently with Section 142.

The same is true for purposes of the Section 242 challenge to the Charter Pre-Approval Requirement. Section 242 does not authorize a stockholder to act as the initial gatekeeper for charter amendments. Only the board has that authority. By purporting to put Lowry at the head of the line, the Charter Pre-Approval Requirement facially conflicts with Section 242.

---

"any circumstances" concept as if it were a settled and widely accepted test, and *Salzberg* adopted it on that basis. Because those assumptions seem debatable, it may be worth giving further consideration to whether Delaware should use the *Salerno* test.

## G.    The Effect of The Consent Agreement

The analysis up to this point demonstrates that the Challenged Provisions were statutorily invalid in the form in which they existed at the time of the lawsuit. But after the plaintiff filed her complaint, the Company implemented the Consent Agreement. As a practical matter, the Committee Waiver enables the independent directors to override the Pre-Approval Requirements.[242] That does not solve the statutory problems under Sections 142 or 242, but it does change the outcome under Section 141(a).

### 1.    The Section 142 Defect

The Consent Agreement does not solve the Section 142 defect for the Officer Pre-Approval Requirement, because the mechanism for appointing, replacing, or making any significant decisions regarding senior officers remains governed by a process that neither the DGCL, the Charter, nor the Bylaws authorizes. The Consent Agreement makes that process more complex by introducing the possibility of a Committee Waiver, but the process remains beyond the statutory pale. The Officer Pre-Approval Requirement still violates Section 142.

### 2.    The Section 242 Defect

The Consent Agreement does not solve the Section 242 defect for the Charter Pre-Approval Requirement. If anything, it exacerbates it.

---

[242] *See* Part I.D. *supra.*

Section 242 establishes a straightforward process in which the board acts as the gatekeeper for charter amendments. Any charter amendment that the board approves then goes to the stockholders. A corporation's charter might impose additional restrictions on charter amendments. A corporation also might agree contractually to impose additional conditions on the implementation of a charter amendment, including additional voting requirements like a majority-of-the-minority vote, but those requirements cannot short-circuit the statutory process.

As modified by the Consent Agreement, the Charter Pre-Approval Requirement continues to short-circuit the statutory process. The Company still must appeal first to Lowry for written permission to proceed. If Lowry disagrees, then the Independent Committee can unanimously approve a Committee Waiver, at which point Lowry would be contractually compelled to consent. Under this system, his consent is still required, but he is contractually obligated to deliver it. Only then can the Section 242 process move forward.

Section 242 does not contemplate that Rube Goldberg structure. The Charter Pre-Approval Requirement continues to violate Section 242.

### 3. The Section 141(a) Defect

The Consent Agreement does resolve the Section 141(a) problem. The Consent Agreement introduces an override in the form of the Committee Waiver, and that override is sufficiently broad to enable the Board to exercise its statutory authority. The Committee Provision imposes tight procedural restrictions on the Independent Committee's exercise of that authority, but the Delaware Supreme Court has drawn

87

a distinction between substantive limitations and procedural restrictions for purposes of Section 141(a) analysis.

The Company argues that the Committee Waiver operates as a fiduciary out, but that is not the case. The Committee Waiver does not force the directors to assess what their fiduciary duties require. It only requires that they determine what "is in the best interests of [the Company] and its stockholders."[243]

If the Consent Agreement stopped there, then its scope would not be sufficient to cure the Section 141(a) problem. Lowry would have free rein to litigate what was "in the best interests of [the Company] and its stockholders" and to argue that the Company had breached the Consent Agreement. The directors would remain bound by a meaningful contractual constraint not found in the Charter.

But the Consent Agreement does not stop there. It combines that test with a subjective standard under which the Independent Committee need only make its determination "in good faith."[244] The Consent Agreement also does not introduce any separate decision-maker, such as a law firm, as the gatekeeper for board action. As a practical matter, that allows the Independent Committee to exercise its discretion freely.

The analysis must continue, however, because the Consent Agreement adds two additional requirements. The vote of the Independent Committee must be

---

[243] DX 4 at 2.

[244] *Id.*

unanimous, and all of the members of the Independent Committee must be present for the vote to constitute a quorum. In the real world, those requirements make a big difference. Absent the Pre-Approval Requirements, the Board would be able to exercise its judgment freely on all of the issues that those provisions cover. Not only that, but by statute, the Board would be able to act through "the vote of the majority of the directors present at a meeting at which a quorum is present . . . ."[245] Under the Charter and Bylaws, a majority of the directors constitutes a quorum.[246] With eleven directors, a quorum is six, and a majority of a quorum is four.

With those parameters, there are 330 combinations of four directors that could take action. Now introduce the Independent Committee and the procedural rules that govern its decision-making. Because all of the members of the Independent Committee must be present to constitute a quorum, and because the vote must be unanimous, there is now only one combination that unlocks the Pre-Approval Requirements.

That seems like a major restriction, but the Company argues that any procedural constraints are irrelevant to a Section 141(a) analysis. The Company

---

[245] 8 *Del. C.* § 141(b).

[246] Bylaws § 3.14. ("Quorum of Directors. The presence in person of a majority of the total members of Board, provided that one of such members present is either the Chairman or the Chief Executive Officer (if the Chief Executive Officer is then a member of the board), shall be necessary and sufficient to constitute a quorum for the transaction of business at any meeting of the Board.")

correctly points out that under Section 141(c)(4) of the DGCL, the unanimous quorum and voting requirements are statutorily permissible.[247]

The Delaware Supreme Court's Section 141(a) jurisprudence has drawn a sharp distinction between substantive and procedural limitations. In *AFSCME*, an institutional investor submitted a proposal for a bylaw that would require reimbursement for a stockholder's reasonable expenses incurred in nominating one or more candidates for election to the board, as long as the stockholder did not seek to elect a majority slate and at least one of the candidates was elected.[248] The corporation asked the SEC for a no-action letter confirming that the corporation could exclude the proposal from its proxy statement. The SEC certified two questions to the Delaware Supreme Court. First, "[i]s the AFSCME Proposal a proper subject for

---

[247] That section states, in pertinent part:

> A majority of the directors then serving on a committee of the board of directors or on a subcommittee of a committee shall constitute a quorum for the transaction of business by the committee or subcommittee, unless the certificate of incorporation, the bylaws, a resolution of the board of directors or a resolution of a committee that created the subcommittee requires a greater or lesser number, provided that in no case shall a quorum be less than ⅓ of the directors then serving on the committee or subcommittee. The vote of the majority of the members of a committee or subcommittee present at a meeting at which a quorum is present shall be the act of the committee or subcommittee, unless the certificate of incorporation, the bylaws, a resolution of the board of directors or a resolution of a committee that created the subcommittee requires a greater number.

8 *Del. C.* § 141(c)(4).

[248] *AFSCME*, 953 A.2d at 230.

90

action by shareholders as a matter of Delaware law?"[249] Second, "[w]ould the AFSCME Proposal, if adopted, cause [the corporation] to violate any Delaware law to which it is subject?"[250]

To answer the first question, the justices considered whether stockholders could enact bylaws that limited board authority under Section 141(a).[251] The Delaware Supreme Court explained that "stockholders of a corporation subject to the DGCL may not directly manage the business and affairs of the corporation, at least without specific authorization in either the statute or the certificate of incorporation."[252] In light of the board's managerial authority, the Delaware Supreme Court held that the stockholders' power to adopt bylaws is "limited by the board's management prerogatives under Section 141(a)."[253]

That meant the Delaware Supreme Court had to determine whether the bylaw limited the board's managerial prerogatives. Focusing on the nature of bylaws generally, the Delaware Supreme Court held that "a proper function of bylaws is not to mandate how the board should decide specific substantive business decisions, but rather, to define the process and procedures by which those decisions are made."[254]

---

[249] *Id.* at 231.

[250] *Id.*

[251] *Id.* at 232.

[252] *Id.*

[253] *Id.*

[254] *Id.* at 234–35.

Applying this principle, the court explained that a bylaw would be valid if it "establishes or regulates a process for substantive director decision-making," but not "one that mandates the decision itself."[255]

For purposes of Section 141(a) analysis, there should not be any difference between what a bylaw can accomplish and what a governance agreement can accomplish. Bylaws are inherently part of a corporation's internal governance arrangement, so Section 141(a) naturally applies.[256] Delaware law also interprets bylaws as a contract to which the stockholders are parties,[257] so bylaws present the same issues of contractual power. During oral argument, the Company's counsel agreed that there would not be any difference between how a court analyzed a bylaw and how a court analyzed the Stockholders Agreement.[258]

Under *AFSCME*, the Committee Provision can validly regulate the procedural operation of the Independent Committee. Those restrictions have a meaningful real-

---

[255] *Id.* at 235.

[256] *See Quadrant II*, 2014 WL 5465535, at *3 ("When evaluating corporate action for legal compliance, a court examines whether the action contravenes the hierarchical components of the entity-specific corporate contract, comprising (i) the Delaware General Corporation Law, (ii) the corporation's charter, (iii) its bylaws, and (iv) *other entity-specific contractual agreements*, such as a stock option plan, other equity compensation plan, or, as to the parties to it, a stockholder agreement." (emphasis added)).

[257] *Chevron*, 73 A.3d at 939 ("As our Supreme Court has made clear, the bylaws of a Delaware corporation constitute part of a binding broader contract among the directors, officers, and stockholders formed within the statutory framework of the DGCL." (first citing *Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010), then citing *Lawson v. Household Fin. Corp.,* 152 A. 723, 726 (Del. 1930)).

[258] Tr. at 74–75.

world impact on how the Independent Committee functions, but their presence does not affect the Section 141(a) analysis.

The Committee Provision sufficiently frees the Board to make substantive decisions on matters otherwise governed by the Pre-Approval Requirements. After the execution of the Consent Agreement, the Challenged Provisions no longer violate Section 141(a).

## III.    CONCLUSION

The plaintiff's motion for judgment on the pleadings is granted in part. The Officer Pre-Approval Requirement is facially invalid under Section 142. The Charter Amendment Pre-Approval Requirement is facially invalid under Section 242. Without the Consent Agreement, all of the Challenged Provisions would be facially invalid under Section 141(a). With the Consent Agreement, the Challenged Provisions survive review under Section 141(a).

Within ten days, the parties will submit a joint letter that attaches an agreed-upon form of order implementing the rulings made in this decision. If the parties cannot agree, they will submit a joint letter outlining their disagreements and proposing a path for resolving them.